**Steven D. CONNER, Plaintiff,**

v.

**SCHNUCK MARKETS, INC., Defendant.**

**No. 94–2498–KHV.**

United States District Court,
D. Kansas.

Nov. 15, 1995.

Stephen J. Dennis, Fairway, KS, Kenneth R. Battis, Kansas City, MO, for plaintiff.

Nancy M. Landis, Office of United States Attorney, Kansas City, KS, Aaron C. Johnson, Spencer, Fane, Britt & Browne, Kansas City, MO, Dennis G. Collins, Lisa K. Boyer, Ja'Ethel Williams, Greensfelder, Hemker & Gale, P.C., St. Louis, MO, for defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

This matter comes before the Court on *Defendant's Motion for Summary Judgment* (Doc. # 49). Plaintiff, Steven D. Conner, a former employee in defendant's dairy frozen foods department, initiated this four-count action, claiming that defendant, Schnuck Markets, Inc., (1) breached its promise to pay him overtime compensation for hours he worked in excess of eight hours per day; (2) violated the Fair Labor Standards Act by failing to pay him overtime compensation for hours he worked in excess of 40 hours per week; (3) violated the Fair Labor Standards Act by terminating him for asserting a claim for overtime compensation due him; and (4) also violated state common law by terminating him for asserting such claim.

Defendant seeks summary judgment on Counts III and IV of plaintiff's complaint. Defendant argues first that plaintiff cannot establish a causal link between his discharge and the protected activity of asserting a claim for overtime pay and second that defendant had a legitimate, nondiscriminatory business reason for terminating him. Therefore, defendant asserts that it is entitled to summary judgment on Count III and Count IV, plaintiff's claims for retaliatory discharge under the Fair Labor Standards Act and under state common law, respectively. Defendant also claims it is entitled to summary judgment on Count IV of plaintiff's complaint because plaintiff has an adequate remedy under federal law for defendant's alleged unlawful retaliation. Therefore, defendant argues that plaintiff's state law claim is precluded, and that this Court should enter summary judgment in defendant's favor on Count IV. For the reasons set forth below, defendant's motion is sustained.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court considers all evidence and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). The nonmoving party, however, "may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). Thus, summary judgment may be entered "against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ While it is not the trial judge's function to weigh the evidence and determine the truth of the matter at the summary judgment stage, summary judgment in favor of the moving party is nonetheless proper if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1518 (10th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995).

### Factual Background [1]

Plaintiff was hired as a dairy frozen food clerk in one of defendant's Kansas stores in January 1991, at the rate of $5.00 per hour.

---

1. The facts set forth in this memorandum and order are either uncontroverted or, where controverted, construed in the light most favorable to the nonmoving party. Immaterial facts and factual allegations not properly supported by the record are omitted.

He received periodic wage increases, and in July 1992, defendant promoted him to the position of lead person in his department at the rate of $9.00 per hour.

On October 4, 1992, an employee reported to defendant that she believed defendant was failing to pay overtime compensation in compliance with federal law. The company undertook a preliminary, internal investigation of its wage and hour practices and, after concluding that some violations had occurred, reported the matter to the United States Department of Labor and prepared an employee survey on which employees could claim unpaid overtime compensation. Defendant mailed the survey to all employees on December 9, 1992, and mailed it again to nonresponding employees on January 4, 1993. In all, defendant mailed 1,697 surveys to current and former employees in its various stores.

Plaintiff received the wage and hour survey from defendant on December 9, 1992. The cover letter to the survey, in pertinent part, read:

Recently it has come to my attention that there may have been instances of inaccurate reporting of hours by some of our Associates here in Kansas City.

I want you to know that it has always been the policy of Schnuck Markets to pay all of its Associates properly for all hours worked.

We are currently reviewing all Time and Attendance system records and, in addition, are requesting that you complete the attached questionnaire and return it to your store manager personally, or use the pre-addressed stamped envelope by December 18, 1992. The United States Department of Labor, Wage and Hour Division, has approved this survey so that our Company can determine whether Schnucks is in compliance with our policy of proper payment for all time worked.

The survey covers the period you have been employed by Schnuck Markets, Inc. I can assure you that if any mistakes are found they will be corrected and the individual paid accordingly.

If you should have any questions regarding this matter, please contact your store manager or me, or you can contact Jenise Kramer, Manager of EEO and Counseling, on a confidential basis at (314) 994-4476.

Plaintiff claims that he worked many overtime hours for which he was not properly paid between February 1991 and January 1993. But plaintiff claims that he did not turn in his survey when requested because he feared reprisal by the company. According to plaintiff, management informed him on or about January 20, 1993, that he would not receive his next paycheck until he turned in the questionnaire. Shortly thereafter, plaintiff took his completed survey, claiming unpaid wages, to Store Manager Ken Ringkamp's office. Plaintiff alleges that Ringkamp told him, "If you want to go anywhere with the company, you'll reconsider this." Plaintiff then withdrew his claim and completed a new survey form wherein he claimed no overtime compensation due; he submitted the new survey to Ringkamp, picked up his paycheck and left for home.

Plaintiff alleges that before January 1993, he had a good relationship with Ringkamp and was often included in social events at which Ringkamp was present. After January 1993, plaintiff began to notice a change in the way he was treated at work. Plaintiff believes that Ringkamp "became cold" toward him, and plaintiff and his wife were no longer invited to social functions or sporting events with the company. Plaintiff was relieved of many of his job responsibilities, and his hours were changed after January 1993. Plaintiff states that he was not permitted to have lunch with vendors, although other employees were not prohibited from doing so.

On May 7, 1993, an employee reported to Ringkamp that plaintiff had accepted a premium, or gift, from a vendor without permission. Defendant claims that it has a policy which prohibits employees from receiving items of value from vendors without prior management approval. In investigating the matter, Ringkamp spoke with Mark Leisman, a Tombstone Pizza representative. Leisman told Ringkamp that he gave plaintiff Tombstone Pizza jackets on two occasions in late March or April 1993 and that plaintiff instructed Leisman to put the jackets in

plaintiff's car at work and return the car keys to plaintiff. In meetings with Ringkamp and with various other Schnucks employees, including Loss Prevention Coordinator Renee Dettmer, plaintiff repeatedly denied taking the jackets, even when confronted with statements made by the Tombstone representative himself and by another store employee who had witnessed the transaction between plaintiff and the Tombstone representative. During one of the meetings, plaintiff told Ringkamp that he thought Ringkamp was "out to get him."[2] On May 26, 1993, Ringkamp informed plaintiff that his employment with Schnuck's was suspended. Before suspending plaintiff, Ringkamp gave him a "second chance." According to plaintiff, Ringkamp told him that if he told the truth about the jackets, Ringkamp would forget about the whole incident; if he did not tell Ringkamp the truth about the jackets, he would be suspended. After plaintiff persisted in denying that he took the jackets from the Tombstone representative, Ringkamp suspended him.

According to defendant, after completing her investigation in Kansas, Dettmer referred the Tombstone matter to her supervisor, Linda Winkler. Winkler is the Security Supervisor in St. Louis, where defendant's corporate headquarters are located. Defendant claims that Winkler met in St. Louis with Mike Panneri, defendant's Manager of Security, informed him of the results of Dettmer's investigation, and recommended that plaintiff be fired. Panneri concurred, and they instructed Ringkamp to terminate plaintiff's employment. Defendant maintains that Ringkamp had nothing to do with the decision to terminate plaintiff's employment and that Winkler and Panneri knew nothing of

plaintiff's participation in the company's wage and hour survey. Defendant also claims that it terminated two other employees between March 1988 and March 1993 for accepting products from vendors without permission.

Plaintiff disputes that Winkler and Panneri were involved in making the decision to terminate him. He contends that Ringkamp terminated his employment. Plaintiff also disputes that the facts concerning the two other employees who were terminated are comparable to the facts surrounding his own termination.

Plaintiff states that he was never advised by management, either orally or in writing, of any policy regarding the receipt of premiums from vendors. He claims that at various times during his employment, he saw employees receive items of value, such as clothing and sports tickets, from vendors. He observed employees openly wearing clothing they had received from vendors both inside and outside the store, and he occasionally attended sporting events with other employees who had received the tickets for such events from vendors. Plaintiff knows of no other employee in any of defendant's Kansas stores who was ever investigated or disciplined in any way for allegedly accepting items of value from vendors.[3] During the three and a half years that Ringkamp served as Store Manager at the Kansas store, he never referred any other matter involving acceptance of premiums from vendors to defendant's Loss Prevention Department.

*Discussion*

Defendant asserts that it is entitled to summary judgment on plaintiff's retaliatory discharge claim because he has not raised

---

**2.** Later, after defendant had terminated him, plaintiff confessed that he had accepted the Tombstone jackets from the representative and that he had repeatedly lied about the transaction.

**3.** The record supports plaintiff's allegation that defendant did not have in place a mechanism for conveying to its employees its avowed policy regarding premiums. However, despite plaintiff's protestations that he did not know of any Schnucks policy prohibiting employees from accepting premiums, his testimony suggests otherwise: When the Tombstone vendor initially arrived with the jackets, he bumped into Ringkamp

and explained that he was going to show the jackets to plaintiff and another employee. Ringkamp sent him away. Plaintiff testified that the other employee then remarked, "That was a close one," and plaintiff replied by saying "something to the effect of 'No Shit.'" Later, when the vendor returned with the jackets and asked where plaintiff would like his, plaintiff responded, "well, don't bring it in the back door again. Put it in the trunk of my car." Plaintiff gave the vendor the keys to his car, and the vendor placed a jacket inside and returned the keys to plaintiff.

any genuine issue of fact to controvert defendant's claim that it terminated him for legitimate, nonretaliatory reasons—that he violated company policy by taking jackets from a vendor without management approval and that he lied to management about doing so. Defendant also maintains that the decision to terminate plaintiff was made by Schnucks personnel in St. Louis who had no knowledge of plaintiff's participation in the wage and hour survey; therefore, defendants argue, plaintiff can establish no causal connection between such protected activity and his discharge.

■ Section 15(a)(3) of the Fair Labor Standards Act provides that it is unlawful for any person

> ... to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act ... or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3). If the immediate cause or motivating factor of an employer's adverse employment action is the employee's assertion of statutory rights, that action violates § 215(a)(3). *See Martin v. Gingerbread House, Inc.,* 977 F.2d 1405, 1408 (10th Cir.1992); *Love v. RE/MAX of America, Inc.,* 738 F.2d 383, 387 (10th Cir.1984).

### A. Count III: FLSA Retaliatory Discharge

■ In evaluating FLSA retaliatory discharge claims at the summary judgment stage, courts have applied the burden shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Marx v. Schnuck Markets, Inc.,* 863 F.Supp. 1489, 1496 (D.Kan.1994); *Brock v. Casey Truck Sales, Inc.,* 839 F.2d 872, 876 (2d Cir.1988); *Strickland v. MICA Information Sys.,* 800 F.Supp. 1320, 1323 (M.D.N.C.1992). Under the *McDonnell Douglas* scheme, plaintiff must first make a prima facie showing of retaliation, which consists of the following factors: (1) engaging in protected activity; (2) an adverse employment action subsequent to or contemporaneous with such protected activity; and (3) a causal connection between the protected activity and the adverse employment action. *See Marx,* 863 F.Supp. at 1496.

■ If plaintiff demonstrates a prima facie case, the burden of production shifts to defendant to articulate a legitimate, nonretaliatory reason for the adverse employment action. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Defendant need not prove the absence of retaliatory motive at this point, but only produce evidence which would dispel the inference of retaliation by establishing the existence of a legitimate reason for the action. *Burrus v. United Telephone Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). If defendant does so, the burden shifts back to the plaintiff to show that the articulated reason was a mere pretext for discrimination; the ultimate burden of persuasion rests at all times with plaintiff. *Id.*

Plaintiff argues that the *McDonnell Douglas* test is inapplicable for two reasons: first, application of the *McDonnell Douglas* test would deprive plaintiff of the opportunity to present his claims to a jury for determination of the relative credibility of his position and defendant's position in this case; and second, *McDonnell Douglas'* shifting allocation of the burden of production does not apply in cases where plaintiff presents direct evidence of retaliation.

■ Plaintiff's first argument fails to persuade this Court that *McDonnell Douglas* does not apply because, in this case, it is the application of well-established summary judgment standards—not the application of the *McDonnell Douglas* test—that prevents plaintiff from presenting his evidence to a jury. Plaintiff's argument is based on *St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), in which the Supreme Court stated that, while a factfinder's rejection of a defendant's explanation for termination would not mandate judgment for plaintiff as a matter of law, it could, "together with the elements of a prima facie case, suffice to show intentional discrimination." *Id.,* at ——, 113 S.Ct. at

2749. Plaintiff stretches this to mean that once he has established a prima facie case from which a jury could infer retaliatory motive, he has come forth with evidence by which the jury could disbelieve defendant's explanation and that, therefore, his claim must necessarily survive summary judgment. If plaintiff's interpretation were true, every plaintiff who could establish a prima facie case of discrimination could automatically escape summary judgment. As Judge Lungstrum stated when confronted by this same argument from the same counsel in a recent case very similar to this one, this Court "does not believe that the decision in *St. Mary's*, which dealt with the effect of an employer's stated reasons for taking an employment action being discredited at the trial stage, affects plaintiff's burden, at the summary judgment level, to produce specific facts, beyond mere conjecture, that an employer's explanation of its employment action is a pretext for intentional discrimination." *Marx v. Schnuck Markets, Inc.*, 869 F.Supp. 895, 898 (D.Kan.1994) (citing *Branson v. Price River Coal Co.*, 853 F.2d 768, 771–72 (10th Cir. 1988)). Summary judgment is appropriately entered "against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. We believe plaintiff has failed to make a sufficient showing to establish the existence of an element essential to his case—that defendant's stated reason for his termination was mere pretext for discrimination. Accordingly, plaintiff's argument regarding *St. Mary's* is unavailing.

 Plaintiff also argues that the *McDonnell Douglas* burden shifting scheme does not apply in cases where there is direct evidence of retaliatory intent. He asserts that this is such a case and, in support, points to Ringkamp's comment to plaintiff—that plaintiff should reconsider his answers to the survey questions if he wanted to go anywhere with the company—when plaintiff initially submitted his wage and hour survey to Ringkamp. It is true that the shifting allocation of the burdens of proof and production set forth in *McDonnell Douglas* does not apply in cases where plaintiff can show direct evidence of the discriminatory basis for the challenged employment decision. *Furr v. AT & T Technologies, Inc.*, 824 F.2d 1537, 1549 (10th Cir.1987) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985)). However, direct evidence of causation is not at issue here. Plaintiff here, like plaintiffs in *Furr*, has confused his offer of specific instances of discriminatory comments, from which he argues the determining cause of the employment decision may be inferred, with direct evidence that his protected participation in the wage and hour survey was the cause of that decision. *See id.* Ringkamp's statements, while they may "form a basis for a direct inference of retaliatory motive," as plaintiff asserts, are not themselves direct evidence of causation. Therefore, the burden shifting analysis of *McDonnell Douglas* still provides a suitable mechanism by which to evaluate plaintiff's retaliatory discharge claims.

The first step plaintiff must take to establish his retaliatory discharge claims is to set forth a prima facie case. The elements of a prima facie case include (1) engaging in protected activity; (2) an adverse employment action subsequent to or contemporaneous with such protected activity; and (3) a causal connection between the protected activity and the adverse employment action. *See Marx*, 863 F.Supp. at 1496.

 Defendant does not dispute that plaintiff engaged in protected activity by submitting a claim for unpaid overtime compensation and that he was subsequently terminated. Defendant does dispute that plaintiff can show any link between his protected activity and the adverse employment action defendant took against him. Defendant argues that because Ringkamp was not involved in the decision to terminate plaintiff's employment and because those who were involved knew nothing of plaintiff's attempt to claim unpaid overtime compensation, plaintiff's case lacks the necessary causal connection.

The Court disagrees. Plaintiff's evidence could convince a reasonable jury that Ringkamp was involved in making the decision to terminate plaintiff. Ringkamp was the Store

Manager at the grocery store where plaintiff was employed. In such capacity, Ringkamp participated from the start in investigating plaintiff's receipt of the Tombstone jackets. Indeed, Ringkamp received the initial report that plaintiff had accepted them. Plaintiff has testified that he met with Ringkamp several times during the course of the investigation, and the record reflects that even after Ringkamp had turned the matter over to defendant's Loss Prevention Department, Ringkamp attended—and perhaps conducted—the investigatory meeting between plaintiff and Loss Prevention Coordinator Renee Dettmer. Finally, Ringkamp was the one who actually terminated plaintiff. In fact, plaintiff recalls that Ringkamp gave him a "second chance" before suspending his employment. According to plaintiff, Ringkamp told him that if he told the truth about the jackets, Ringkamp would forget about the whole incident; if he did not tell Ringkamp the truth about the jackets, he would be suspended. After plaintiff persisted in denying that he took the jackets from the Tombstone representative, Ringkamp suspended him. On these facts, a reasonable jury could determine that Ringkamp was involved in making the decision to terminate plaintiff's employment. This fact, together with plaintiff's allegations that Ringkamp "became cold" toward him and excluded him from company activities after he submitted and withdrew his claim for overtime compensation, convinces the Court, although the evidence is not strong, that plaintiff has carried his burden of establishing a prima facie case.

If plaintiff succeeds in presenting a prima facie case of unlawful retaliation, the burden of production shifts to defendant to articulate a legitimate, nonretaliatory reason for the adverse employment action. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

Defendant is not required to prove the absence of retaliatory motive at this point, but only to produce evidence which establishes the existence of a legitimate reason for the action. *Burrus,* 683 F.2d at 343. If defendant does so, the burden shifts back to the plaintiff to show the articulated reason was a mere pretext for discrimination; the ultimate burden of persuasion rests at all times with plaintiff. *Id.* Even assuming plaintiff has carried his burden of demonstrating a prima facie case of retaliation here, defendant has also discharged its duty of coming forth with evidence that it had legitimate grounds for terminating plaintiff's employment. Plaintiff, in turn, has offered no evidence which tends to establish that defendant's grounds were pretextual.

Defendant maintains that it terminated plaintiff for violating the company's policy against accepting vendor premiums without prior approval of management and for lying to management during its investigation of the Tombstone jackets incident. Plaintiff argues that defendant's first reason is pretextual: he asserts that no such policy regarding vendor premiums existed at Schnucks. However, plaintiff does not controvert the fact that he repeatedly gave untruthful statements to various Schnucks personnel.[4]

Defendant has presented adequate evidence that such a policy existed. Plaintiff's behavior in attempting to conceal the Tombstone transaction, both at the time the representative gave him the jackets and when the company was investigating the incident, belies his assertion that he did not know that accepting vendor premiums was prohibited. Furthermore, defendant has shown that it terminated at least one other employee, Brian Bovinette, for accepting vendor premi-

4. Plaintiff has not challenged—and likely could not successfully challenge on the facts of this case—defendant's decision to terminate plaintiff because of his dishonesty. As defendant correctly points out, " '[t]he decision to terminate an employee who is considered to be untrustworthy is the prerogative of the employer, and it is not the court's province to second guess such decisions once it is established that a prohibited motive was not involved.' " *Marx,* 863 F.Supp. at 1497 (quoting *John v. Lujan,* 1992 WL 41354,

*10 (D.Kan.1992)); *see also Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir. 1988). This is not to say that every plaintiff whose employer purportedly terminates him or her for dishonesty will necessarily fail to establish a claim of retaliatory discharge. However, on the facts in this case—where plaintiff has presented no evidence that defendant's stated reasons for his termination were pretextual—the Court must appropriately defer to the employer's prerogative.

ums.[5] Although plaintiff asserts that Bovinette's situation was not analogous to his own, he has not explained this assertion, and the Court cannot divine the difference.

Plaintiff urges the Court to disregard defendant's evidence that it terminated Bovinette for violating defendant's policy prohibiting employees from accepting vendor premiums. Plaintiff argues that such evidence is hearsay and is merely conclusory. The Court disagrees. Linda Winkler's affidavit describes her involvement in terminating Bovinette, a 14–year employee of defendant, for accepting beer from a beer vendor. Such affidavit evidence is not hearsay; Winkler's account of the events surrounding that termination is based upon her personal knowledge and participation in it. See Fed.R.Civ.P. 56(e); Schweitzer–Reschke v. Avnet, Inc., 874 F.Supp. 1187, 1191 n. 2 (D.Kan.1995). Furthermore, her affidavit testimony regarding the existence of the policy is not merely conclusory; rather, it is supported by the other evidence discussed above. Therefore, Winkler's testimony is properly considered in deciding this motion. See Marx, 869 F.Supp. at 899.

Finally, in arguing that his termination was pretextual, plaintiff offers only his own unsupported assertions that other employees received premiums without being disciplined. Plaintiff does not point to any specific instances, nor does he indicate any similarly-situated employee who received vendor premiums with impunity.[6] Plaintiff's own conclusory allegations without specific supporting facts lack probative value, see Thomas v. International Business Machines, 48 F.3d 478, 485 (10th Cir.1995), and mere assertion or conjecture as to intent or pretext is not enough to survive summary judgment. Branson, 853 F.2d at 772.

In short, plaintiff has failed to present any evidence that creates a question of fact as to whether defendant's proffered nonretaliatory reasons for terminating him were pretextual. The Court finds that a reasonable jury could not, on the evidence presented by plaintiff, find that the immediate cause or motivating factor behind plaintiff's termination was his assertion of a claim (which he withdrew almost immediately upon asserting it) for unpaid overtime compensation.

**B. Count IV: State Law Retaliatory Discharge Claim**

■ Count IV of plaintiff's complaint asserts a retaliatory discharge claim under Kansas law based on the public policy exception to the employment-at-will doctrine. Plaintiff does not dispute that a full remedy is available to him under the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3); instead, he argues that he does not have an adequate alternative remedy available under the Kansas Wage Payment Act and that remedies available to him under the FLSA in any event do not preclude his state common law claim of retaliatory discharge.

In Polson v. Davis, 895 F.2d 705 (10th Cir.1990), the Tenth Circuit held that a plaintiff would not be permitted to assert a common law retaliation claim because an adequate alternative statutory remedy existed under Kansas law. Id. at 709–10. Plaintiff initially argues that Polson does not apply in this case because this case deals with a federal statutory remedy rather than a state one. However, the Tenth Circuit has explicitly applied the Polson rationale to preclude a state law claim for retaliatory discharge where the plaintiff had available adequate federal remedies. See, e.g., Masters v. Daniel Int'l Corp., 917 F.2d 455, 457 (10th Cir. 1990).

**5.** Defendant claims it has terminated two employees under similar circumstances. However, the events involving one of them are described in an affidavit offered by Panneri, who was not disclosed on defendant's original witness list. On plaintiff's motion in limine, the Court ruled that Panneri's testimony is inadmissible.

**6.** Plaintiff does allege that Ringkamp received premiums himself, and this fact is uncontroverted by defendant. However, Ringkamp is not similarly-situated to plaintiff. Defendant's policy allegedly prohibits employees from accepting vendor premiums without prior approval from management. Since Ringkamp was the store manager, he was not in the same situation as plaintiff with respect to obtaining management approval.

Moreover, courts have frequently applied the *Polson* rationale to preclude state law retaliatory discharge claims where the plaintiff has had an adequate alternative federal remedy. *See, e.g., Emerson v. Boeing Co.* 1994 WL 149191, *4–5 (D.Kan.1994), *aff'd,* 53 F.3d 342 (10th Cir.1995) (plaintiff's public policy claim precluded by available remedy under Title VII); *Groh v. City of Lenexa, Kan.,* 1991 WL 79662, *3 (D.Kan.1991) (plaintiff's retaliatory discharge claim precluded by available remedy under the First Amendment and 42 U.S.C. § 1983). "In order to succeed on a claim for retaliatory discharge under Kansas law, a plaintiff must show not only that [he] was discharged in contravention of public policy, but also that [he] has no alternative remedy under state *or federal* law." *Braun v. Dillon Companies, Inc.,* 1995 WL 261142, *10 (D.Kan.1995) (emphasis added) (holding state retaliatory discharge claim precluded by Title VII and KAAD remedies).

Furthermore, the court in *Polson* reasoned that public policy exceptions to the employment-at-will doctrine are recognized only under limited circumstances; where plaintiff is already protected by an adequate statutory remedy, providing a public policy-based remedy is simply unnecessary. *See Polson,* 895 F.2d at 709–10. There is no reason to believe that this rationale would apply differently when the statutory remedy exists under federal law rather than state law. In fact, reasoning that the public policy underlying the FLSA was the same public policy that justifies exception to the employment-at-will doctrine, some courts have specifically precluded state law retaliatory discharge claims such as plaintiff's when adequate remedies under the FLSA have been available:

> It is clear that the whole rationale undergirding the public policy exception is the vindication or the protection of certain strong policies of the community. If these policies or goals are preserved by other remedies, then the public policy is sufficiently served. Therefore, application of

the public policy exception requires two factors: (1) that the discharge violate some well-established public policy; and (2) that there be no remedy to protect the interests of the aggrieved employee or society.

*Prewitt v. Factory Motor Parts, Inc.,* 747 F.Supp. 560, 565–66 (W.D.Mo.1990) (quoting *Wehr v. Burroughs Corp.,* 438 F.Supp. 1052, 1055 (E.D.Pa.1977)). The *Prewitt* court concluded that the "public policy that would be furthered by a wrongful discharge claim based on a violation of § 215(a)(3) is fully vindicated" by plaintiff's FLSA claim. *Id.* We find such reasoning persuasive and believe that Kansas courts would refuse to recognize plaintiff's public policy state law claim because he has a full and complete remedy available under 29 U.S.C. § 215(a)(3). Consequently, plaintiff's state law claim for retaliatory discharge is precluded by available remedies under the FLSA.

Moreover, even if plaintiff's state law retaliatory discharge claim were not precluded by remedies available under the FLSA, we find, based on the foregoing analysis of the evidence, that plaintiff could not persuade a reasonable jury that defendant unlawfully terminated him in retaliation for claiming unpaid overtime compensation.[7] Summary judgment therefore lies on plaintiff's claims for retaliatory discharge both under the FLSA and under state common law.

**IT IS THEREFORE ORDERED** that *Defendant's Motion for Summary Judgment* (Doc. # 49) be and hereby is sustained.

**IT IS FURTHER ORDERED** that Count III and Count IV of plaintiff's complaint be and hereby are dismissed.

---

7. Courts in this district have used the *McDonnell Douglas* burden shifting approach for analyzing state as well as federal retaliatory discharge claims. *See, e.g., Huffman v. Ace Elec. Co., Inc.,* 883 F.Supp. 1469, 1475 (D.Kan.1995). There-

fore, the foregoing discussion applies with equal force to plaintiff's state common law retaliatory discharge claim and to his FLSA retaliatory discharge claim.