**Kristi WILLIAMS, Plaintiff,**

v.

**PRISON HEALTH SERVICES, INC., Defendant.**

**No. 00–1366–JTM.**

United States District Court, D. Kansas.

July 19, 2001.

Norman R. Kelly, Norton, Wasserman, Jones & Kelly, Salina, KS, for plaintiff.

Alexander B. Mitchell, II, Mary T. Malicoat, Klenda, Mitchell, Austerman & Zuercher, L.L.C., Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

This matter comes before the court on defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. The motion is fully briefed and ripe for determination. For the reasons set forth below, the court grants defendant's motion.

### I. Factual Background

Prison Health Services (PHS) contracts with the State of Kansas to provide medical care and treatment to incarcerated inmates in the State's correctional facilities. Final Pretrial Order, at p. 2. In March 1992, PHS employed plaintiff, Kristi Williams at the Ellsworth Correctional Facility (ECF) as a registered nurse. Upon hiring, PHS knew plaintiff was epileptic. On December 15, 1999, plaintiff resigned.

Plaintiff contends PHS violated the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.*, by failing to reasonably accommodate her disability. Plaintiff further asserts constructive discharge based on a hostile work environment.

In June 1999, plaintiff began to experience increased seizure activity, after working early morning or late night shifts (5:15 a.m., 6:15 a.m. or 7:45 p.m.). She did not experience seizure activity when working the 7:30 a.m. shift. Williams chose not to inform PHS because the seizure activity was not interfering with her work performance.

On September 17 1999, Williams suffered a grand mal seizure and called Susan Mehler, Health Services Administrator, informing her she could not work. When

plaintiff returned to work the next day, she requested that Mehler not assign her to early morning or evening shifts, and if required, she would provide a note from her physician. Later that week, Mehler told plaintiff that PHS required a physician's note. Plaintiff spoke with her physician, LaDona Schmidt, M.D., who advised plaintiff to have a sleep-deprived EEG on October 14 followed by a neurologist consultation by Trent Davis, M.D., on October 21. On September 23, Williams provided Mehler a note from Dr. Schmidt, indicating that Williams was to work "no early or late shifts." Schmidt Affidavit, at ¶ 6.

Plaintiff returned to work, but alleges that she experienced discrimination. When Beth Komarek, Director of Nursing, returned from sick leave on September 27, neither Komarek nor Mehler said anything about plaintiff's epileptic seizures, other than Mehler's acknowledgment that she received a doctor's note. Komarek said nothing to plaintiff unless she initiated conversation. Moreover, Williams noticed staff members avoiding her, not responding when she said hello, and not answering questions.

PHS contracted with the State of Kansas to provide 24 hour RN coverage. Final Pretrial Order, at p. 14. On September 30, Komarek and Mehler proposed ten-hour shifts for the nursing staff. After the meeting, Komarek met with plaintiff individually and told plaintiff that all nurses would work ten hour shifts, beginning at 4:00 a.m, 6:00 a.m., 10:00 a.m., and 8:00 p.m. Williams Affidavit, at p. 1. Williams replied by stating, "What does this mean for me?" *Id.* Komarek said she didn't know what plaintiff meant. Plaintiff told Komarek of her work restrictions, upon which Komarek stated, "Everyone else has to work these hours, they don't have a choice if they want to keep their job. If you won't..." *Id.* Plaintiff replied, "It's not that I won't, but I can't physically at this time." *Id.* Komarek responded, "I don't know if I can accommodate you. I have to be fair." *Id.* At the conclusion of the conversation, Komarek suggested plaintiff take sick leave until she became "stabilized." Williams Affidavit, at p. 2. Afraid she would forget the conversation, plaintiff immediately transcribed the conversation and subsequent comments she felt to be offensive.

Plaintiff, believing that her job was in jeopardy, contacted Donita Cawby, an Equal Employment Office representative for ECF. On October 1, Williams told Cawby about a long-standing joke Komarek initiated. According to plaintiff, Komarek joked that if Williams were to have a seizure, Komarek would "pull your [Williams'] pants down around your ankles, squirt K–Y in your crotch, and let you think an inmate boinked you." Williams Affidavit, at p. 2. Plaintiff never told Komarek that she was offfended because she couldn't cry or become embarrassed in front of her peers, particularly where the cause was her supervisor. However, employees believed that plaintiff thought the joke was funny as she herself joked about the disability. Mehler Deposition, at p. 37.

Plaintiff did not tell Cawby that, on a previous occasion, plaintiff asked Komarek to stop using the "N" word in her presence. Williams Affidavit, at p. 2. Upon this request, Komarek turned to plaintiff and repeated the word over and over. *Id.* Cawby told plaintiff that she would discuss the issue with Ray Roberts, ECF Warden, but informed Williams that she was unsure if her office had "jurisdiction" because plaintiff was a contract employee. *Id.* Cawby asked plaintiff what she hoped to

achieve. Plaintiff told her that she wanted to work.

On the following days, plaintiff worked her daytime hours as scheduled. On October 4, during her vacation, Williams called an ADA hotline to determine her rights. The hotline put plaintiff in touch with Dawn Merriam at the Occupational Center of Central Kansas (OCCK).

Plaintiff returned to work the next day, apprehensive of her situation. In the afternoon, Mehler called plaintiff into her office and asked if she was unhappy. Plaintiff told her that she was concerned about comments made to her. She told Mehler that she did not feel comfortable talking to Mehler about those comments, but that she had spoken with Cawby and would discuss the issues with Mehler at a later time. After work, plaintiff was unable to eat, experienced nervousness, and did not sleep.

On October 6, plaintiff experienced a myoclonic seizure. She phoned her doctor and explained that despite the note, PHS did not comply with the request. Dr. Schmidt and plaintiff agreed that she should take sick leave until Dr. Schmidt received the results from the neurologist examination. Williams Affidavit, at p. 3. Plaintiff contacted Komarek, who told her to deliver or fax a doctor's note to the office.

Mehler later contacted plaintiff and told her that she had not taken the proper route by talking to Cawby, an EEO representative, unrelated to PHS. Mehler advised plaintiff to follow the Problem Solving Procedure, outlined in the employee handbook. Mehler agreed to mail the information to plaintiff and set an appointment with plaintiff, although the appointment was not set that day. Dr. Schmidt's office faxed the note for plaintiff's sick leave to PHS on October 11.

Mona Burt, State PHS Director, Mehler, plaintiff, and Merriam met on October 19 in Salina, Kansas. Burt told plaintiff that it was wrong to contact an EEO representative before following the proper PHS channels. Williams Affidavit, at p. 4. After plaintiff told Mehler and Burt her concerns, they asked plaintiff if she told Komarek that she did not appreciate the joking. Plaintiff responded that she did not. *Id.* Burt asked plaintiff how she would explain the fairness of plaintiff's reduced hours to staff members. Merriam told Burt that a medical accommodation should be kept confidential. Burt asked Merriam in what capacity she attended the meeting. Merriam responded that she was with plaintiff as an advocate and friend. The parties agreed that PHS would receive results from the neurologist's examination before PHS adjusted plaintiff's schedule. *Id.*

Upon receipt of the EEG results, Dr. Schmidt temporarily restricted plaintiff's work schedule to no more than 8½ hours of work per day between 7:30 a.m. to 4:00 p.m. with a maximum of 5 days per week and no driving. Dr. Schmidt's faxed a notice to Mehler on October 22 indicating that plaintiff was only able to work 8 ½ hour shifts, 5 days per week, due to plaintiff's medical condition. Williams Affidavit, at p. 5. When Mehler received the restrictions, she called plaintiff to discuss them. Plaintiff told Mehler that there were additional limitations coming from Dr. Schmidt's office. Mehler told plaintiff, "I think you are playing this to the hilt." Williams Affidavit, at p. 5. Mehler said she would contact Human Resources and call plaintiff on Monday. Later that day, Dr. Schmidt's office faxed additional restric-

tions to Mehler, indicating that plaintiff could work 8½ hour shifts, five days per week, between the hours of 7:30 a.m. to 4:00 p.m. Mehler Affidavit, at pp. 50–51.

Plaintiff's husband retrieved certified mail for the plaintiff on October 25, from Fran Elsky, Human Resources Generalist for PHS. The letter, dated October 22, reviewed the Family and Medical Leave Act and stated: "This office has been notified that you will be unable to work as of October 6, 1999 due to a health condition that affects you, your spouse, child, or parent which makes you unable to perform the essential functions of your job." Williams Affidavit, at p. 5.

Thereafter, on November 1, plaintiff called Donna Sue Franklin, Director of Human Resources for PHS at its corporate headquarters in Brentwood, Tennessee. When Franklin asked plaintiff about the FMLA paperwork, plaintiff questioned why she needed to complete the paperwork because Dr. Schmidt authorized her to return to work on October 22. Williams Affidavit, at p. 6. Franklin told plaintiff that she was placed on FMLA leave after she was absent for three days and that plaintiff needed to return the paperwork to "protect her job." *Id.* Plaintiff told Franklin she wanted to speak to Burt on November 4 since plaintiff understood that she was taking sick leave during her absence. *Id.*

At the meeting, Burt and Franklin agreed to amend the schedule to accommodate plaintiff's restrictions, but suggested that plaintiff's physician send a statement concerning a six-month period for the restrictions. Williams Affidavit, at p. 7. Plaintiff advised Franklin that her physician did not always respond right away, as she was very busy. *Id.* Franklin replied that it would not be a problem because she

spoke to Dr. Schmidt on two occasions and said she was very nice and helpful. *Id.* After the meeting, plaintiff called Dr. Schmidt to get the six-month restriction in writing. Plaintiff explained the request and thanked Dr. Schmidt for her patience and the recent calls made to PHS. Dr. Schmidt denied speaking with a PHS representative and seemed aggravated by the request. *Id.* Therefore, plaintiff and Dr. Schmidt agreed that her office would not send any information to PHS unless requested by plaintiff's lawyer. *Id.*

When Elsky contacted plaintiff on November 30 for Dr. Schmidt's medical certification, plaintiff advised Elsky that there was no information to provide to PHS, and if she needed additional information, she must contact plaintiff's lawyer. Williams Affidavit, at p. 8. Franklin called plaintiff later to inform plaintiff that she was an employee advocate for PHS and was unable to speak to plaintiff's lawyer because he would have to speak to the PHS lawyer. Plaintiff reiterated that Dr. Schmidt gave the information to Mehler.

On December 2, Franklin contacted plaintiff to ask her if she wanted to return to work the next day. Plaintiff stated that she wanted Franklin to alert Mehler regarding plaintiff's return. Williams Affidavit, at p. 10. Franklin told plaintiff that she would contact Mehler and that plaintiff should expect a call from Mehler the following day. On December 10, Mehler called plaintiff and advised that she spoke with Franklin about setting up a meeting with plaintiff, Komarek, and herself.

The meeting occurred on December 14, 1999. Upon entering the building, plaintiff noticed a Christmas party being held without her. In order to distract plaintiff's attention to the party, Komarek and Mehler escorted her away from the party. At

the meeting, Williams discussed the joking and 10 hour shifts with Komarek and Mehler. Komarek told plaintiff, "I won't be blamed for your medical condition" and that she would never understand why it was medically necessary for plaintiff to work 7:30 a.m. to 4:00 p.m. Williams Affidavit, at p. 11.

Nonetheless, PHS assigned plaintiff to work 7:30 a.m. to 4:00 p.m. on December 15. Plaintiff contends that, upon her return, members of the clinic were hostile in several ways. First, they did not welcome her. *Id.* Second, Komarek escorted two guests into the office and quickly shut the door. Williams Affidavit, at pp. 11–12. Third, PHS staff failed to hang plaintiff's Christmas stocking when they decorated the office. Williams Affidavit, at p. 12. Fourth, PHS gave plaintiff's office to Janeen White and stored plaintiff's belongings in a back closet. Williams Affidavit, at pp. 12–13. Fifth, Jenny Wise, a staff member, avoided plaintiff, did not speak to plaintiff, and gave plaintiff misinformation. Williams Affidavit, at p. 12. Sixth, Komarek was hostile to plaintiff in refusing to acknowledge her when she entered the clinic in the morning; loudly stating that plaintiff's office belonged to Janine White; handing a file to plaintiff in a rude and condescending manner; and responding to plaintiff in a perturbed manner when plaintiff informed her that she needed dates off to attend doctor appointments. Williams Affidavit, pp. 11–12. Finally, Cindy Lamia, an employee at the clinic, seemed very uncomfortable and became nervous when she saw plaintiff. Williams Affidavit, at p. 12. Plaintiff notes that Lamia assumed plaintiff's epilepsy was a possible reason for her absence. Lamia Deposition, at p. 38. After returning from lunch with her husband on December 15, 1999, plaintiff submitted her resignation to Komarek.

Plaintiff filed a complaint with the Kansas Human Rights Commission on February 26, 2000, alleging that she was "subjected to unfair treatment, denied accommodation, and put on FMLA because of [her] disability." Kansas Human Rights Commission Complaint, at p. 2.

## II. Summary Judgment Standards

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. *Jurasek v. Utah State Hosp.,* 158 F.3d 506, 510 (10th Cir. 1998). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Baker v. Board of Regents,* 991 F.2d 628, 630 (10th Cir.1993). The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita* ). The opposing party may not rely upon mere allegations

or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Analysis and Discussion

Defendant argues summary judgment is appropriate on two bases. First, PHS reasonably accommodated plaintiff under the ADA. Second, plaintiff's assertion that she was constructively discharged fails to state a claim. For the following reasons, the court grants summary judgment.

### A. Plaintiff's ADA Claim:

■ The parties largely disagree on element three of the ADA prima facie case. Plaintiff argues that she has epilepsy, she was able to perform the essential elements of her job with accommodation, but plaintiff was subjected to unfavorable terms and conditions of employment because she was disabled. The court disagrees.

■ To make a prima facie case, plaintiff must show "(1) that [s]he is 'disabled within the meaning of the ADA', (2) that [s]he is qualified—with or without reasonable accommodation; and (3) that [s]he was discriminated against because of [her] disability." *Butler v. City of Prairie Village, Kan.*, 172 F.3d 736, 748 (10th Cir. 1999) (quoting *Siemon v. AT&T Corp.*, 117 F.3d 1173, 1175 (10th Cir.1997)); *see also Aldrich v. Boeing Co.*, 146 F.3d 1265, 1269 (10th Cir.1998), *cert. denied*, 526 U.S. 1144, 119 S.Ct. 2018, 143 L.Ed.2d 1030 (1999); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997); *White v. York Int'l Corp.*, 45 F.3d 357, 360–61 (10th Cir.1995). The ADA, 42 U.S.C. § 12112, provides:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

As used within subsection (a) of this section, the term 'discriminate' includes ... (5)(A) not making reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation could impose undue hardship on the operation of the business of such covered entity.

42 U.S.C. § 12112(a), (b)(5)(A) (1995).

"Reasonable accommodation" may include, but is not limited to: job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities. 42 U.S.C. § 12111(9)(B) (1994).

■ PHS did not discharge plaintiff. Instead, plaintiff resigned her job. The court initially notes that discharge is not a requisite element of a prima facie case within the ADA. Plaintiff must show, however, some formal relevant employment related discrimination. "The prima facie case is a flexible standard that may be modified to relate to different factual situations." *Schnake v. Johnson County Community College*, 961 F.Supp. 1478, 1481

(D.Kan.1997) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 n. 13 (10th Cir. 1995) (citing *Mohammed v. Callaway*, 698 F.2d 395, 398 (10th Cir.1983) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 1824 n. 13, 36 L.Ed.2d 668 (1973)))).

According to the applicable ADA section, 42 U.S.C. § 12112(b)(5)(A), discrimination includes not making reasonable accommodation. However, PHS provided reasonable accommodation to plaintiff. Plaintiff's restrictions limited her to working five days per week from 7:30 a.m. to 4:30 p.m. On December 2, 1999, PHS gave plaintiff the opportunity to return to work within the restrictions. For this reason, the court believes that PHS reasonably accommodated plaintiff. In fact, PHS gave plaintiff the specific accommodation requested.

Alternatively, plaintiff asserts that PHS failed to accommodate her by failing to act in good faith while engaging in the interactive process as required by the ADA. She argues that PHS violated the good faith requirement by taking nearly two months to return plaintiff to work. Finally, plaintiff attempts to distinguish *Templeton*, a case which defendant argues is factually analogous.

■■■ 29 C.F.R. § 1630.2(*o*)(3) requires an interactive process:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

The Federal Regulations "envision an interactive process that requires participation by both parties." *Templeton v. Neodata Services, Inc.*, 162 F.3d 617, 619 (10th Cir.1998) (quoting *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996)). Essentially, this interactive process includes good-faith communications between the employer and employee. *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1172 (10th Cir.1999); *Taylor v. Phoenixville Sch. Dist.*, 174 F.3d 142 (3d Cir.1999). As defendant notes, meeting with the employee, requesting information about the employee's condition and limitations, indicating to the employee that the employer is considering the request, and offering and discussing reasonable alternatives all demonstrate good faith. *Taylor*, 174 F.3d at 162.

Despite plaintiff's assertions, the court finds that it was plaintiff who impeded the interactive process. PHS received plaintiff's work restrictions on October 22, 1999. At that point, PHS needed complete medical certification to assess the appropriate accommodations. Plaintiff claims that this FMLA paperwork was used to impede and prolong her return to PHS. In fact, the FMLA paperwork had little impact on the interactive process or PHS' attempts to accommodate plaintiff.

PHS made numerous attempts to meet with plaintiff to discuss the work restrictions. First, PHS contacted plaintiff on November 1 through Burt when Elsky could not reach plaintiff at home. Plaintiff refused to complete the FMLA paperwork for Elsky and wanted to talk to Burt at the scheduled meeting later in the week. Second, PHS met with plaintiff on November 4 and told plaintiff that they would look at the schedule to accommodate plaintiff.

When PHS asked for medical certification concerning the duration of plaintiff's work restrictions, plaintiff instructed her doctor not to release any information to PHS except through her lawyer.

Additionally, PHS made every effort to return plaintiff to work in a timely manner. Plaintiff received FMLA paperwork dated October 22 from PHS. PHS needed the paperwork because Williams took leave beyond three days. Williams Affidavit, at p. 5. Although plaintiff believes that PHS impeded the process by requiring FMLA paperwork, PHS used the FMLA paperwork pursuant to company policy. PHS could not predict how long plaintiff would be absent. As a result, PHS needed to take measures to protect plaintiff's opportunity to continue leave with pay. Those efforts do not directly relate to PHS' efforts to accommodate plaintiff's disability. Delay in returning to work is insufficient when the employer is engaged in a good faith interactive process.

This case is similar to *Templeton v. Neodata Services, Inc.,* 162 F.3d 617 (10th Cir.1998), in which the plaintiff similarly stopped the interactive process when she refused release of medical certification to her employer. The *Templeton* court stated:

> Here, as in *Beck,* the employee's failure to provide medical information necessary to the interactive process precludes her from claiming that the employer violated the ADA by failing to provide reasonable accommodation. An employer cannot be expected to propose reasonable accommodation absent critical information on the employee's medical condition and the limitations it imposes.

*Templeton,* 162 F.3d at 619 (citing *Beck v. University of Wisconsin Bd. of Regents,* 75 F.3d 1130, 1136 (7th Cir.1996)). PHS needed to know the duration of plaintiff's work restrictions to assess reasonable accommodations in light of the State's contract. Plaintiff interrupted the interactive process by refusing to give this information to defendant and is thus precluded from claiming that PHS failed to provide reasonable accommodation within the ADA. *Id.*

## B. Plaintiff's Constructive Discharge Claim:

Defendant PHS contends that summary judgment is proper on plaintiff's constructive discharge claim. First, defendant asserts that plaintiff failed to exhaust her administrative remedies, thus blocking all statutory relief. Second, common law does not recognize a claim for constructive discharge based on a hostile work environment. In the alternative, plaintiff's claim fails to satisfy the objective standard for a hostile work environment under Title VII.

Plaintiff argues that she filed the hostile work environment claim by submitting a thirteen-page chronological summary of events from September to December 1999.[1] Additionally, plaintiff believes that

---

1. Plaintiff recently filed a Motion To Substitute Exhibits for Plaintiff's Response to Defendant's Motion For Summary Judgment (dkt.49). While the court grants this motion to substitute plaintiff's affidavit and its attachments as Exhibit I to Plaintiff's Response to Defendant's Motion for Summary Judgment (dkt.43), the court does not change its finding that plaintiff failed to exhaust her administra-tive remedies. Plaintiff's lawyer argues (Plaintiff's Response, at p. 36) that plaintiff has no control over the materials included in the KHRC complaint. However, plaintiff did have control over the KHRC complaint in that she signed the complaint (Def. Exh. K at 3) and therefore, reviewed the complaint in its entirety.

*Guliford v. Beech Aircraft Corporation,* 768 F.Supp. 313 (D.Kan.1991), allows the court to consider the KHRC intake form and the investigation to determine whether additional claims not stated in the administrative charge should be included. Finally, plaintiff seeks to distinguish *Aramburu v. Boeing Co.,* 112 F.3d 1398 (10th Cir.1997).

▇ "A plaintiff must exhaust [her] administrative remedies before bringing suit under Title VII and the Kansas Act Against Discrimination." *Smith v. Board of Public Utilities,* 38 F.Supp.2d 1272, 1284 (D.Kan.1999) (quoting *Aramburu v. The Boeing Co.,* 112 F.3d 1398, 1409 (10th Cir.1997) (citing *Jones v. Runyon,* 91 F.3d 1398, 1399–1401 (10th Cir.1996), *cert. denied,* 520 U.S. 1115, 117 S.Ct. 1243, 137 L.Ed.2d 326 (1997))); *Van Scoyk v. St. Mary's Assumption Parochial Sch.,* 224 Kan. 304, 580 P.2d 1315, 1317–18 (1978). The 10th Circuit requires an allegation to be "reasonably related" to the complaint filed as an administrative charge. *Smith,* 38 F.Supp.2d at 1284 (quoting *Aramburu,* 112 F.3d at 1409 (citing *Brown v. Hartshorne Public School Dist. No. 1,* 864 F.2d 680, 682 (10th Cir.1988))). The *Guliford* court stated, "[T]he critical question is whether the claims set forth in the civil complaint come within the 'scope of the EEOC investigation' which can reasonably be expected to grow out of the charge of discrimination." *Guliford,* 768 F.Supp. at 316 (quoting *Powers v. Grinnell Corp.,* 915 F.2d 34, 39 (1st Cir.1990); *see also Sosa v. Hiraoka,* 920 F.2d 1451, 1456 (9th Cir. 1990); *Whitten v. Farmland Industries, Inc.,* No. 88–2637–0 (D.Kan. Apr. 25, 1991) (1991 WL 75695, 1991 U.S. Dist. Lexis 6075); *Rucker v. Frito–Lay, Inc.,* No. 89–4172–S (D.Kan. Nov.21, 1990) (1990 WL 203167, 1990 U.S. Dist. Lexis 16566)).

▇ Plaintiff's KHRC complaint stated that she was "subjected to unfair treatment, denied accommodations, and put on FMLA because of [her] disability." KHRC Complaint, at p. 2. Here, plaintiff's reasonable accommodation claim involves a different factual background than her hostile work environment claim. In the reasonable accommodation claim, the KHRC considers whether the plaintiff and defendant engaged in a good-faith interactive process. There is no dispute that PHS provided reasonable accommodation. The only dispute is whether PHS violated the good faith standard in the interactive process. In contrast, plaintiff's hostile work environment claim arises from separate facts, namely, alleged comments and actions taken towards plaintiff with respect to her disability. Such facts are wholly unrelated to the reasonable accommodation claim. Because plaintiff only raised the accommodation claim before the KHRC, and the hostile work environment claim is not reasonably related, that claim is barred.

▇ Moreover, the court is not persuaded that plaintiff's KHRC intake form is sufficient to qualify as a proper charge. As defendant notes in its Memorandum In Opposition To Plaintiff's Motion To Substitute Exhibits For Plaintiff's Response To Defendant's Motion For Summary Judgment (dkt.51), the 11th Circuit found in *Pijnenburg v. West Georgia Health System, Inc.,* 255 F.3d 1304 (11th Cir.2001), that an unsworn intake questionnaire form detailing complaints of harassment and retaliation was not intended to function as a charge. The 11th Circuit chose to follow *Park v. Howard Univ.,* 71 F.3d 904, 908–09 (D.C.Cir.1995), holding that an unsworn "Private Sector Employment Pre–Complaint Questionnaire" did not qualify as an EEOC charge. Similarly, this court finds that plaintiff's KHRC Complaint Informa-

tion Sheet, labeled "For Information Purposes Only—NOTES" does not qualify as a KHRC charge, even with plaintiff's fourteen page chronological summary attached. The court will only examine KHRC Complaint, which does not include a hostile work environment charge. Accordingly, plaintiff failed to exhaust her administrative remedies on this claim.

Finally, the court finds that *Aramburu* is factually analogous. The *Aramburu* court ruled that plaintiff's claims for wrongful discharge and a hostile work environment were not "reasonably related" so as to permit the plaintiff to claim wrongful discharge in district court without exhausting administrative remedies. *Aramburu*, 112 F.3d at 1409–10. The court believed that Aramburu's wrongful discharge claim stemmed from allegations that his supervisor manipulated attendance records, while the hostile environment claim was based on allegations that his supervisor harassed him and required him to work beyond his medical restrictions. *Id.* As noted above, the court finds that the present reasonable accommodation claim and the constructive discharge claim are factually dissimilar. Therefore, *Aramburu* supports the court's conclusion that plaintiff failed to exhaust her administrative remedies on the latter claim.

■■■■ Plaintiff also argues that defendant failed to properly raise the defense of plaintiff's failure to exhaust administrative remedies. According to plaintiff, U.S. Magistrate Judge Humphries allowed defendant to raise this defense, despite its absence in defendant's answer, but indicated that the court would allow plaintiff to conduct some limited discovery in the fu-

ture should an issue arise regarding the defendant's admitted failure to timely raise such defense. Plaintiff states that if the court allows the defense, then plaintiff should be afforded limited discovery on the issue. A party seeking additional time for discovery must, "show how additional time will permit rebuttal of a movant's assertions".[2] *Bryant v. O'Connor*, 671 F.Supp. 1279, 1282–83 (D.Kan.1986) (quoting *Patty Precision v. Brown & Sharpe Mfg. Co.*, 742 F.2d 1260, 1265 (10th Cir.1984)). The court believes that the KHRC Complaint Form is sufficient to demonstrate that plaintiff did not exhaust her administrative remedies by failing to assert constructive discharge. Plaintiff does not demonstrate the need for additional discovery and has failed to show that additional discovery will assist her in rebutting the defense. Thus, summary judgment is appropriate.

■■■■ Assuming, *arguendo*, that plaintiff exhausted her administrative remedies, the court finds that she would not prevail under a statutory constructive discharge theory based on common law or the ADA. Although the 10th Circuit does not recognize constructive discharge claims under the ADA, the court addresses the standard for the claim under Title VII. 42 USC § 12117(a); *see also Olds v. Alamo Group (KS), Inc.*, 889 F.Supp. 447, 449 (D.Kan.1995) ("Each title of the ADA has its own enforcement section. Title I of the ADA incorporates the remedies and procedures of Title VII."). Additionally, the KAAD applies Title VII standards. *See Woods v. Midwest Conveyor Co., Inc.*, 231 Kan. 763, 767, 648 P.2d 234, 238–39 (1982). Actionable harassment must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and cre-

---

**2.** Even assuming additional time would assist plaintiff, the court's ruling would not be al-

tered given that plaintiff has failed to meet the statutory standards as set forth below.

ate an abusive working environment.'" *Bolden v. PRC Inc.*, 43 F.3d 545, 550 (10th Cir.1994) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir.1982))). "Constructive discharge occurs when a reasonable person in the employee's position would view the working conditions as intolerable. That is to say the working conditions, when viewed objectively, must be so difficult that a reasonable person would feel compelled to resign." *Yearous v. Niobrara County Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir.1997) (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir. 1992)). A plaintiff must show that she had "*'no other choice* but to quit.'" *Id.* (quoting *Woodward*, 977 F.2d at 1401) (quoting *Irving v. Dubuque Packing Co.*, 689 F.2d 170, 172 (10th Cir.1982)) (emphasis in original). A hostile work environment is determined by examining the totality of circumstances, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; ... whether it unreasonably interferes with an employee's work performance"; and the context in which the conduct occurred. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).

 Plaintiff claims that the following incidents created a hostile work environment: 1) Komarek and staff members avoiding her during September 26–30; 2) Komarek stating that she didn't know if she could accommodate plaintiff after speaking with her individually; 3) Komarek's long-standing joke reported to Cawby; 4) Burt asking Williams how she would explain plaintiff's reduced hours to other staff members; 5) Mehler telling plaintiff she was carrying "this [work restrictions] a bit too far"; 6) holding a Christmas party without plaintiff; 7) Komarek stating she would not be blamed for plaintiff's medical condition; 8) staff and Komarek avoiding her on December 15; and 9) Komarek moving White into plaintiff's office and storing plaintiff's personal items in the back closet.

These actions do not create a hostile work environment. Indeed, while the long-standing joke can be construed as offensive, the environment taken as a whole in no way reflects a hostile work environment under the statutory standards. Many of the alleged actions are entirely consistent with the treatment of any employee who is absent for an unknown duration. Mere avoidances and discomfort of other employees can reasonably be expected after a prolonged absence and subsequent reintroduction. All actions, except for the long-standing joke occurred in a five-hour period on December 15. Intermittent comments and offensive actions during a short period do not constitute the level of harassment required by law. *See Bolden*, 43 F.3d at 551 (finding three racial jokes and slurs over a period of eight years to be meritless because they were not pervasive). Therefore, the court finds after a thorough review of the circumstances, as a whole, that plaintiff has failed to show the existence of a hostile work environment.

 Finally, the court finds that summary judgment is appropriate on plaintiff's common law constructive discharge claim. Kansas follows an at-will employment regime. Although Kansas courts recognize public policy exceptions to at-will employment, *Murphy v. City of Topeka–Shawnee County*, 6 Kan.App.2d

488, 630 P.2d 186 (1981), conduct covered by Kansas statutory law cannot be actionable under the public policy exception. *See Polson v. Davis,* 895 F.2d 705 (10th Cir.1990). In *Polson,* the 10th Circuit recognized that Kansas federal district courts were split on the issue of whether the public policy exception should be extended to conduct covered by the KAAD, K.S.A. 44–1001, *et. seq.* Thus, it stated, "[f]aced with the need to decide, we believe, as the district court, that the Kansas Supreme Court would adopt the view that KAAD provides an adequate and exclusive state remedy for violations of the public policy enunciated therein." *Polson,* 895 F.2d at 709 (citing *Polson v. Davis,* 635 F.Supp. 1130, 1150 (D.Kan.1986)). Thereafter, the 10th Circuit asked the Kansas Supreme Court, "does the remedy provided by certain provision of Occupational Safety and Health Act (OSHA) for employees who allege that they have been discharged in retaliation for filing complaints under that statute preclude filing of a Kansas common law wrongful discharge claim under state's public policy exception to at-will employment?" *Flenker v. Willamette Industries, Inc.,* 266 Kan. 198, 967 P.2d 295 (1998). Although the Kansas Supreme Court addressed the question with respect to OSHA, the court noted that "*Polson* was correct in surmising the Kansas rule to be that an adequate alternative remedy precludes a common-law retaliatory discharge action." *Flenker,* 266 Kan. at 209, 967 P.2d at 303. The *Flenker* court also noted that federal courts follow the *Polson* interpretation of Kansas law (exceptions to the at-will doctrine should be limited to where there is no adequate alternative remedy).

*Flenker,* 266 Kan. at 200, 967 P.2d at 298 (citing *Conner v. Schnuck Markets, Inc.,* 906 F.Supp. 606, 614 (D.Kan.1995)).

Moreover, in *Anco Constr. Co. v. Freeman,* the Kansas Supreme Court held that the *Murphy* public policy exception applies to interests protected by *state* law. *Anco,* 236 Kan. 626, 693 P.2d 1183 (1985) (emphasis added). Under these two standards, plaintiff's claim for common law constructive discharge fails. The ADA and KAAD provide adequate remedies allowing plaintiff to recover for constructive discharge. Therefore, the court will not allow plaintiff to pursue a common law claim under the public policy exception to the employment at-will doctrine.

IT IS THEREFORE ORDERED this _____ day of July, 2001 that defendant's motion for summary judgment (dkt. no. 38) and plaintiff's motion to substitute exhibits (dkt.49) are GRANTED.