**Lorraine BECK, Plaintiff–Appellant,**

v.

**UNIVERSITY OF WISCONSIN BOARD OF REGENTS, University of Wisconsin–Milwaukee, and Chancellor John Schroeder, Defendants–Appellees.**

No. 95–2479.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 1, 1995.

Decided Jan. 26, 1996.

---

Milton S. Padway (argued), Mark J. Goldstein, and M. Nicol Padway, Padway & Padway, Milwaukee, WI, for Plaintiff–Appellant.

James E. Doyle, Office of the Attorney General, Wisconsin Department of Justice and Richard Briles Moriarty (argued), Wisconsin Department of Justice, Madison, WI, for Defendants–Appellees.

Before CUMMINGS, CUDAHY and FLAUM, Circuit Judges.

CUMMINGS, Circuit Judge.

This appeal concerns the alleged failure of the University of Wisconsin to provide "reasonable accommodations" within the meaning of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), to Lorraine Beck, an employee of the University from 1967 to 1993 who suffered from osteoarthritis and depression during the latter part of her employment. The district court entered summary judgment in favor of the University, and we now affirm.

## I.

Beck began full-time employment with the University of Wisconsin–Milwaukee in 1967. In 1979, she became Secretary to the Dean of the School of Nursing, a position that she held for 11 years. In August 1991, Beck began a three-month medical leave for conditions described to the University as "multiple medical conditions" and "post viral fatigue." Before taking leave, she had frequently stated that her secretarial position required two full-time employees and a student helper and she made informal inquiries into a possible transfer, but no formal application was made. Beck returned on October 7, 1991, and was then assigned to the Department of Health Maintenance in the School of Nursing, a position with substantially different duties but the same classification and salary as her secretarial position.

For the first month in her new position, Beck was not required to perform any regular duties but was instead allowed to learn and practice the word-processing program in her own office. Thereafter, she suffered from osteoarthritis aggravated by repetitive keyboarding. A February 1992 letter from her doctor stated, in part, "I would recommend, if possible, that she avoid repetitive keyboard use, in which case, quite possibly her symptoms will resolve." In general, Beck believed that her overall workload needed to be reduced, and her immediate supervisor, Linda Bennett, was aware of this fact. In May 1992, Beck was hospitalized with severe depression and anxiety, which she claims was a direct result of the stress of her new job and the lack of training and support in that job. She returned to work on June 9, 1992, with the following letter from her doctor:

Mrs. Lorraine Beck is released to return to work on Thursday June 11, 1992. She is to work one half day on Thursday and she is to work full days thereafter. She has suffered recurrent major depression. This is a serious medical illness and may require some reasonable accommodation so that she does not have a recurrence of this condition.

Beck's employer sought to have her sign a release allowing the University to obtain further information from her doctor. She did not sign the release, no further information was provided, a scheduled meeting to discuss possible accommodations never took place, and Beck continued in her job.

In July 1992, Beck took medical leave again. Upon returning to work on August 10, 1992, she gave the University the following letter from her doctor:

Lorraine Beck has completed (9) days of hospitalization for depression and medication readjustment. In returning to work on 8/10/92 she may require appropriate assistance with her work load. An adjustable computer keyboard would be helpful in preventing further difficulties with her hands. All in all, tayloring [sic] her work load to what she & your staff feel she can realistically accomplish, would do much to assist in her transition back to work, and future productivity.

Also upon returning, Beck received a memorandum from Bruno Wolff, the assistant dean, stating that he did not understand what accommodations were necessary and, until he received more information, she would be assigned to work directly with Bennett and would receive all tasks from Bennett. Wolff also informed her that she would be temporarily moved from room 536 to room 636, which Beck describes as a small, isolated, cold room with no exterior windows.

During the time Beck worked in room 636, she was not given an adjustable keyboard, but was instead given a wrist rest. She was also given much less work than other secretaries. The University claims that the August 10 reassignment was intended to reduce Beck's apparent stress level by reducing the number of people who could assign her work, eliminating "rush" projects, and assuring that she was only assigned one task at a time. Beck ultimately received much less work than Bennett expected, which may have been due to her lack of proficiency with the word-processing program and the fact that her tasks were limited to non-rush, overflow work. Bennett did, however, assign Beck to the switchboard for extended periods to keep her occupied. Nonetheless, Beck asserts that her attempts to seek out work or otherwise occupy her time were either rejected or ignored.

Beck also alleges that the assignment from room 536 to 636 was a great source of stress. She complains that room 636 had poor ventilation, was cold and damp, and had no exterior windows. Room 536, however, also had no exterior windows. Bennett claims that temperature fluctuations existed throughout the building and were beyond her control. The University further alleges that it moved Beck so that she would be closer to Bennett and would not have to share an office as she had in room 536. Also, the University attempted to find her an office even closer to Bennett but was unable to do so. The other available offices were all located in high traffic areas or were much smaller. The University planned to wait for the expected retirement of workers on the seventh floor before relocating her.

On September 25, 1992, Beck went on medical leave for the third time and received electric-shock therapy. She requested and was granted a six-month unpaid medical leave of absence in November 1992, which was later extended until October 1993. Beck filed a charge with the Equal Employment Opportunity Commission ("EEOC") in June 1993, asserting that her rights under the ADA and a federal age discrimination law were violated. Having satisfied all procedural requirements, she filed suit in the district court in September 1993 under Title I of the ADA. After filing suit, Beck requested that she be reinstated at the University in a different department. Her request was denied and she was told that she had to report to work again in the Department of Health Maintenance. She did not and was therefore terminated by the University.

■ Defendants moved for summary judgment, arguing primarily that the University did not know exactly what accommodations were necessary and that it was only able to accommodate Beck based on available information. Beck's summary judgment response for the first time made detailed allegations regarding the move to "a small, isolated, cold and damp file room," the fact that Bennett gave "her nothing to do," and the fact that defendants never provided her with an adjustable keyboard. Defendants' summary judgment reply included an affidavit from Bennett regarding the new allegations in Beck's response.* The district court entered summary judgment against Beck, and she now appeals. We review the district court's decision *de novo*, with all evidence submitted and the legitimate inferences to be drawn therefrom viewed in the light most favorable to plaintiff. *East Food & Liquor, Inc. v. United States*, 50 F.3d 1405, 1410 (7th Cir.1995).

## II.

■ The ADA prohibits discrimination against disabled individuals. 42 U.S.C. § 12112. The prohibition extends not only to denial of employment opportunities based on vocationally irrelevant disabilities, but extends to discrimination based on disabilities that impair the individual's ability to perform her job. *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 541 (7th Cir.1995). Thus the ADA defines discrimination as including an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer]...." 42 U.S.C. § 12112(b)(5)(A).

The central issue in this appeal is whether the University provided Beck with reasonable accommodations. Beck claims it did not. The University claims that it never understood exactly what accommodations Beck required, that it tried in vain to determine what accommodations were necessary, and that it provided the best accommodations possible given its limited understanding of Beck's disability. The University essentially argues that it would have provided reasonable accommodations if Beck had simply told them what to do. Beck responds in the alternative, stating that she did tell the University what to do or that the University should have known what to do. Thus the crux of this dispute is one not clearly answered by the ADA: does the employer or the employee bear ultimate responsibility for determining exactly what accommodations are needed?

■ An employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations—a duty dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate. Thus the Act requires only reasonable accommodations "to the *known* physical or mental limitations" of an employee. 42 U.S.C. § 12112(b)(5)(A) (emphasis added). An employer that has no knowledge of an employee's disability cannot be held liable for not accommodating the employee. Various other provisions of the ADA demonstrate that the employer's knowledge of the disability is a prerequisite to finding liability. For example, the Act prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the *known* disability of an individual." 42 U.S.C. § 12112(b)(4) (emphasis added). There is no dispute that the University knew of Beck's disabilities.

---

* Beck argues on appeal that the district court improperly considered Bennett's affidavit, which was submitted for the first time with defendants' summary judgment reply brief. We conclude that the district court properly considered the affidavit given that it was submitted in response to Beck's arguments in her summary judgment response regarding the adjustable keyboard and the move to room 636, which were there raised

for the first time. "[W]here the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment, reply papers—both briefs and affidavits—may properly address those issues." *Baugh v. City of Milwaukee*, 823 F.Supp. 1452, 1457 (E.D.Wis.1993), affirmed, 41 F.3d 1510 (7th Cir.1994).

By the statutory language, "reasonable accommodation" is limited by the employer's knowledge of the disability. See *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928 (7th Cir. 1995). Whether it is also limited by the employer's knowledge of the reasonable accommodation is a trickier question. An "accommodation" within the meaning of the ADA is not some vague, ill-defined remedy. The ADA defines "reasonable accommodation" as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). We have stated, "It is plain enough what 'accommodation' means. The employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *Vande Zande*, 44 F.3d at 543. An accommodation is something concrete—some specific action required of the employer. See *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 666 (7th Cir.1995) (asking for a "second chance" is not an ADA "accommodation"). Therefore, someone, either the employer or the employee, bears the ultimate responsibility for determining what specific actions must be taken by the employer.

■ The employer has at least some responsibility in determining the necessary accommodation. The federal regulations implementing the ADA state:

> To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(*o*)(3) (1995). But the regulations envision an interactive process that requires participation by both parties:

> [T]he employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability.

29 C.F.R. pt. 1630, app.; see also *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 677 (1st Cir.1995).

■ The facts reveal that Beck and the University did engage in an interactive process. For example, Beck returned to work twice with letters from her doctor that prompted the University to both schedule a meeting to discuss accommodations and draft a memorandum to Beck explaining that her requests were unclear. It is also apparent from the record that the parties talked informally about Beck's problems on a number of occasions. It is equally clear from the record, however, that the interactive process broke down. The most noteworthy event is the cancellation of the June 1992 meeting. Beck claims the University inexplicably canceled the meeting to discuss reasonable accommodations, and the University retorts that Beck refused to sign a release allowing it to obtain additional information from her doctor. Neither the ADA nor the regulations assign responsibility for when the interactive process fails.

■ No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility. For example, the cause of the breakdown might be missing information. The regulations envision such a cause:

> [I]n some instances neither the individual requesting the accommodation nor the em-

ployer can readily identify the appropriate accommodation. For example, the individual needing the accommodation may not know enough about the equipment used by the employer or the exact nature of the work site to suggest an appropriate accommodation. Likewise, the employer may not know enough about the individual's disability or the limitations that disability would impose on the performance of the job to suggest an appropriate accommodation.

29 C.F.R. pt. 1630, app. Where the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process. The determination must be made in light of the circumstances surrounding a given case.

Applying the concepts of good faith and reasonable effort to the facts of this case, we find that responsibility for failure to isolate the necessary specific accommodations falls on Beck and that the University never knew exactly what action it needed to take. Beck points to no facts indicating that the University obstructed her effort to acquire reasonable accommodations. When Beck returned from her first leave, the University assigned her to a different position with a decreased workload. When she returned from her second leave, the University scheduled a meeting and asked her to sign a release so that it could get more information from her doctor; she never signed a release. When she returned from her third leave, Beck received a memorandum from the assistant dean stating that he needed more information to know how to accommodate her disability; she never provided additional information. At no point did the University fail to respond in some manner to Beck's requests for accommodation, and there is nothing in the record from which we can discern any attempt by the University to sweep the problem under the rug.

Quite to the contrary, the University took numerous steps to accommodate Beck based on information available to it. Regarding her osteoarthritis, Beck requested through her doctor that the University reduce Beck's repetitive keyboard use (in the February 1992 letter) and suggested that an adjustable computer keyboard would be helpful (in the August 1992 letter). The University responded to both requests, substantially reducing Beck's workload and providing her with a wrist rest. Beck offers no evidence that the wrist rest, as compared to an adjustable keyboard, was an unreasonable accommodation of her osteoarthritis. Nor does she assert that her osteoarthritis continued or worsened once the University decreased her workload. Rather, Beck contends that the reduction in work was so severe that the University failed to reasonably accommodate her other disability—depression.

But the University did respond to the information it was given regarding Beck's depression. The record shows that the University had the following information: through informal complaints from Beck, it knew that she believed her overall workload was too high; through the June 1992 letter from her doctor, it knew that she suffered "recurrent major depression" that "may require some reasonable accommodation"; and through the August 1992 letter, it knew that she needed "tayloring [sic] of her work load to what she & your staff feel she can realistically accomplish." Upon returning from her first leave, Beck was given a new position in which she was permitted to merely practice the word-processing program for the first few months. Upon returning from a third leave, the University assigned Beck to work with only one supervisor and reduced her workload to substantially less than other secretaries. She was no longer assigned rush projects and had only to work on one project at a time—all in an effort by the University to reduce her stress level. Beck then complained that the workload was too low. In response, Bennett attempted to drum up additional work and assigned Beck to work at the switchboard for extended periods.

Beck argues that a genuine issue of material fact exists as to whether the University followed Beck's doctor's advice, and she further asserts that the University's actions bear absolutely no relationship to the doctor's advice. We agree with the district

court that no reasonable jury could so find. The doctor's letters asked only for "reasonable accommodations" and eventually specified adjustments to Beck's workload as such an accommodation. The record clearly reveals that the University adjusted her workload in accordance with its understanding of the disability. At no point did Beck tell the University exactly what she needed. When she needed less work, that is what she got; when she asked for more, the record reveals that Bennett tried to get her more. Beck further argues that reassignment to room 636 from room 536 was a source of stress, but it is apparent from the record that the University—based on its understanding of her disability—thought at the time that it was doing the right thing. Uncontradicted evidence in the record also indicates that the University was looking to relocate Beck once again based on her dissatisfaction with room 636.

We are further persuaded by the fact that the information required to determine the necessary accommodations was of the type that only Beck could provide. The missing information in this case regards Beck's medical condition, not the particular workings of the University. See 29 C.F.R. pt. 1630, app. (quoted above). It does not appear in the record, nor does Beck argue, that she failed to specify a necessary accommodation because she did not sufficiently understand the nature of the work environment to enable her to suggest an accommodation. The fact that the missing information concerns the employee's medical condition might not always indicate that the employee is responsible for failing to specify a necessary accommodation, but where, as here, the employer makes multiple attempts to acquire the needed information, it is the employee who appears not to have made reasonable efforts. See *Carrozza v. Howard County,* Md., 45 F.3d 425, 1995 WL 8033 (4th Cir.1995) (unpublished disposition) (summary judgment in favor of employer appropriate where employee suffering from manic depression failed to articulate any reasonable accommodation).

\* After preliminary examination of the briefs, the court notified the parties that it had tentatively

## III.

Once an employer knows of an employee's disability and the employee has requested reasonable accommodations, the ADA and its implementing regulations require that the parties engage in an interactive process to determine what precise accommodations are necessary. In this case, the interactive process broke down. The employer was left to guess what actions it should take, and the employee was left frustrated that her disability was seemingly not accommodated. Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown. But where, as here, the employer does not obstruct the process, but instead makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed, ADA liability simply does not follow. Because the University was never able to obtain an adequate understanding of what action it should take, it cannot be held liable for failure to make "reasonable accommodations." The judgment is therefore affirmed.