# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 17, 2014        Decided August 12, 2014

No. 12-5374

ELLA WARD,
APPELLANT

v.

ROBERT MCDONALD, SECRETARY, U.S. DEPARTMENT OF
VETERANS AFFAIRS,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01414)

*Karen A. Khan* argued the cause for the appellant.

*Alexander D. Shoaibi*, Assistant United States Attorney, argued the cause for the appellee. *Ronald C. Machen Jr.*, United States Attorney, and *R. Craig Lawrence*, Assistant United States Attorney, were on brief.

Before: HENDERSON and MILLETT, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Circuit Judge* MILLETT.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Ella Ward was an attorney advisor at the Board of Veterans Appeals (BVA), a part of the United States Department of Veterans Affairs (VA). After developing a medical condition that required lengthy daily treatments and prevented her from sitting at a desk for long periods, she sought an accommodation allowing her to work full-time from home. Ward supported her request with two physicians' letters containing terse descriptions of her condition. When her supervisors asked for additional information to use in determining a reasonable accommodation, Ward resigned. She then sued Eric Shinseki (since replaced by Robert McDonald), in his capacity as Secretary of the VA, claiming the BVA had violated her rights under the Rehabilitation Act of 1973 (Act), 29 U.S.C. §§ 701 *et seq.*, by failing to accommodate her disability. Ward also claims she was constructively discharged because the failure to accommodate her disability left her with no choice but to resign. The district court granted summary judgment to the VA Secretary on both claims. We affirm.

## I. Background

## A. The Rehabilitation Act

"The Rehabilitation Act of 1973 governs employee claims of handicap discrimination against the Federal Government. Its basic tenet is that the Government must take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result." *Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993). The Act provides that "[n]o otherwise qualified individual with a disability" shall be discriminated against by a federal agency "solely by reason of her or his disability." 29 U.S.C. § 794(a).

The Act expressly incorporates the standards applied under the Americans with Disabilities Act (ADA). *Id.* § 794(d); *see also* 29 C.F.R. § 1614.203(b). The ADA in turn bars discrimination against a "qualified individual on the basis of disability," 42 U.S.C. § 12112(a), and defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires," *id.* § 12111(8); *see Mogenhan v. Napolitano*, 613 F.3d 1162, 1165 (D.C. Cir. 2010); *Woodruff v. Peters*, 482 F.3d 521, 527 (D.C. Cir. 2007). "[T]hat is, an individual with handicaps is 'qualified' if she can perform the essential functions of her position with reasonable accommodation. If she can perform these functions *without* reasonable accommodation, so much the better—she is, of course, still qualified." *Carr v. Reno*, 23 F.3d 525, 529 (D.C. Cir. 1994). A "reasonable accommodation" may include "job restructuring, part-time or modified work schedules . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B); *accord* 29 C.F.R. § 1630.2(*o*)(2)(ii).

## B. Factual Background[1]

When a veteran's claim for benefits is denied by a local or regional office of the VA, the veteran may appeal to the BVA. The judges who decide such appeals are assisted by attorney advisors who read the case files, review the evidence and prepare draft opinions. Beginning in 2001, Ward served as one such attorney advisor. Hers was the quintessential desk job—reading, writing, typing—with the only physical duty

---

[1] Because we are reviewing the district court's grant of summary judgment to the VA Secretary, we view the evidence in the light most favorable to Ward. *Mogenhan*, 613 F.3d at 1165; *Langon v. Dep't of Health & Human Servs.*, 959 F.2d 1053, 1058 (D.C. Cir. 1992).

being that she had to carry sometimes unwieldy case files from the judges' offices to her desk. She typically worked eight- to ten-hour days and, like her colleagues, was expected to produce three "credits" per week—each credit corresponding to the preparation of roughly one case.

In 2005, Ward began to suffer from chronic severe lymphedema of the lower right extremity, which causes her right foot and leg to swell with retained fluid. The condition substantially limits Ward's ability to go up and down stairs, carry moderately heavy case files and travel to and from work. It is exacerbated by long periods of sitting at a desk. To manage the condition, Ward must frequently drain excess fluid, elevate her leg, bandage it and/or place it in a compression machine. The treatments take one to three hours at a time and some require her to disrobe.

In mid-2006, Ward converted to part-time status for a few months so that she could receive treatments at the hospital. She returned to full-time status in September 2006. She also took some leave time pursuant to the Family Medical Leave Act (FMLA). Ward testified that she struggled at times to meet the three-credit per week expectation, *see* Joint Appendix (JA) 97–98, but it is undisputed that her final performance review, dated April 5, 2007, rated her "[f]ully [s]uccessful or better," JA 447.

Ward's condition began to deteriorate and in early 2007 she first requested an accommodation. After speaking in March 2007[2] with her then-supervisor Constance Tobias, in April Ward presented her interim supervisor Mark Greenstreet with a letter from Dr. David Rose, a cardiothoracic and vascular surgeon. The letter was brief. It stated that Ward

---

[2] Unless otherwise indicated, all events occurred in 2007.

"has been receiving physical therapy treatments for a chronic medical condition of the right lower extremity that requires routine daily care at home" and that "she is unable to apply the treatment routinely at work, which exacerbates the condition." JA 205. Rose's letter concluded that Ward "will benefit from a schedule that allows her to work from home. The maximum number of daily work hours will be determined as the condition stabilizes." JA 205.

On May 3, Ward met with Greenstreet, Jonathan Kramer and another supervisor to discuss her request. They asked for more details on Ward's condition, which request Ward asked that they put in writing. Greenstreet did so. In a letter bearing the same date, he explained that he understood Ward to be "requesting an arrangement to work at home" but that "additional medical information is needed to process your request. Specifically, your physician needs to provide more details concerning the diagnosis and prognosis." JA 243. The letter set forth the information the BVA needed so that it could evaluate Ward's "ability to perform the duties of [her] position" and determine "what specific accommodations would be required." JA 243.

In late May, Ward submitted another letter, this time from Dr. Alice Fuisz, an internist. The letter contained the information set forth above regarding Ward's condition and prescribed treatment. It explained that Ward "needs medical accommodations to work at home" because sitting for long periods exacerbates her condition and therefore Ward "should sit for only short intervals of time as tolerated, and be able to apply treatment routines whenever needed during the work-day." JA 195. Fuisz's letter noted that the treatment routines "can take from 1 to 3 hours at a time" and that Ward's "disability also affects travel to and from work, but she should

be able to commute to work once a week as required [to retrieve new case files]."   JA 195.

On May 25, Ward met with Steven Cohn, who had since replaced Greenstreet as Ward's supervisor.   Cohn told Ward to consider working part-time because he was concerned that she could not maintain a full-time schedule given the length of her daily treatments.   On May 31, Cohn and Ward met again, with Kramer also present this time.   The parties' accounts of that meeting differ.   Cohn and Kramer attested that they were concerned Ward could not maintain a full-time schedule given her condition and the length of daily treatments and therefore asked for more information from her physician specifying that she was able to work full-time.   Ward attested that Cohn and Kramer flatly denied her full-time work-from-home request during the meeting, instead offering her a part-time work-from-home accommodation.   Ward asked that the BVA's decision on her accommodation request be put in writing.

As requested, on June 5, Cohn sent a memo to Ward which "serve[d] to follow-up on the May 31, 2007 meeting."   JA 246.   The memo stated that "the [BVA] will strive to provide you with a reasonable accommodation" but that, as discussed in the meeting, "it is not evident to the [BVA], based on the medical documentation you have provided, that the [BVA] can reasonably accommodate your request for a flexiplace [work-from-home] arrangement."   JA 246.   The memo outlined two questions left unanswered by Ward's physicians' letters.   First, the memo asked whether Ward would be able to carry case files to and from work once a week.   Second, it noted that Ward's job requires sitting at a desk for prolonged periods—a requirement which would be no different in a work-from-home   arrangement—and   expressed   concern whether, factoring in time for treatment, Ward would be able to

log sufficient hours to meet a full-time schedule. JA 246–47. Accordingly, the memo asked that Ward obtain a letter from her physician addressing these two questions so that the BVA could "process [Ward's] request for a flexiplace arrangement." JA 247. The memo did not state any decision—one way or the other—on Ward's accommodation request.

Ward did not respond. Instead, on June 11, she submitted a letter of resignation. On June 22, she asked that her resignation not take effect—and that she remain on leave-without-pay status under the FMLA—until the Office of Personnel Management adjudicated her pending claim for disability retirement benefits. Then, on July 30, Ward sent a letter to the BVA's human resources personnel asking that the BVA "*immediately terminate* the deferred status of my resignation and process my involuntary resignation/constructive discharge immediately. . . . Because of BVA's illegal and discriminatory actions in denying a reasonable accommodation for my chronic disability by allowing me to work at home as many other attorneys with disabilities do at the BVA, I was forced out of my job and had no recourse but to resign." JA 258.

In response, a BVA personnel officer sent Ward a letter dated August 8. The letter disputed Ward's assertions that her accommodation request had been denied and that she had been forced to resign. It changed the BVA's tune on the need for more information, however, stating: "[A]lthough you never submitted any additional medical information as requested, the [BVA] has nevertheless reconsidered your reasonable accommodation request and is willing to consider allowing you to try work-from-home on a full-time basis." JA 261. The letter asked that Ward respond within five days of August 8, but Ward attested that she did not receive it until more than five days later. She never responded.

### C. District Court Proceedings

Ward obtained a notice of right to sue from the Equal Employment Opportunity Commission (EEOC) and timely filed suit in district court. Her complaint alleged two violations of the Act: (1) the BVA failed to accommodate her disability; and (2) in so doing, the BVA constructively discharged her by deliberately creating intolerable working conditions, thus leaving her no choice but to resign. After discovery, the parties cross-moved for summary judgment.

The district court granted summary judgment to the VA Secretary on both claims. *Ward v. Shinseki*, No. 10-cv-1414, 2012 WL 5839711 (D.D.C. Nov. 19, 2012), *reprinted in* JA 862–81. It reached three conclusions with respect to Ward's failure to accommodate claim: (1) the BVA acted in good faith by engaging in an interactive process to determine a reasonable accommodation but Ward walked away from that process, *see* JA 873–76; (2) the BVA's August 8 letter offered Ward the very accommodation she sought, *see* JA 876–79; and (3) Ward had not demonstrated that she could perform the essential functions of her job with an accommodation, *see* JA 879–80. Having rejected Ward's failure to accommodate claim, the district court held that her constructive discharge claim failed *a fortiori*. JA 880–81.

Ward timely appealed. We review the district court's grant of summary judgment *de novo*. *Mogenhan*, 613 F.3d at 1165. "Summary judgment is appropriate only if 'there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'" *Id.* (quoting FED. R. CIV. P. 56(c)(2)). "A dispute about a material fact is not 'genuine' unless 'the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## II.   Failure to Accommodate Claim

To prevail on her claim that the BVA failed to accommodate her disability, Ward must produce sufficient evidence that (1) she was a qualified individual with a disability, (2) the BVA had notice of her disability and (3) the BVA denied her request for a reasonable accommodation. *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1307–08 (D.C. Cir. 2010).   Ward bears the burden of proving these elements by a preponderance of the evidence.   *Barth*, 2 F.3d at 1186. The second element is undisputed:   The BVA had notice of Ward's condition.   The district court concluded that Ward had not satisfied the first element because she failed to demonstrate that she could perform the essential functions of her job with an accommodation.   *See* JA 879–80.   We express no opinion on that conclusion, however, because we agree with the district court that Ward failed to satisfy the third element:   No reasonable jury could find that Ward's accommodation request was denied in light of the BVA's continuing good-faith dialogue with Ward to determine an appropriate accommodation, which dialogue was cut short by Ward's sudden resignation.   *See* JA 873–76.

Few disabilities are amenable to one-size-fits-all accommodations.   To meet its obligations under the Act, then, an employer needs information about the nature of the individual's disability and the desired accommodation—information typically possessed only by the individual or her physician.   An individual seeking accommodation need not provide medical evidence of her condition in every case:   "[A]n employee confined to a wheelchair would hardly need a doctor's report to show that

she needed help in getting to her workstation if this were accessible only by climbing a steep staircase." *Langon*, 959 F.2d at 1058. But "[w]hen the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation." *Stewart*, 589 F.3d at 1309 (quoting 29 C.F.R. pt. 1630 app. § 1630.9). EEOC regulations therefore provide:

> To determine the appropriate reasonable accommodation it may be necessary for the [agency] to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(*o*)(3); *see also Mogenhan*, 613 F.3d at 1167 & n.4.

The process contemplated is "a flexible give-and-take" between employer and employee "so that together they can determine what accommodation would enable the employee to continue working." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005) (quotation marks omitted); *see also Mogenhan*, 613 F.3d at 1167–68 & n.4; *Stewart*, 589 F.3d at 1308–09. "[N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Sears*, 417 F.3d at 805 (quotation marks omitted). Thus,

> courts should look for signs of failure to participate in good faith or failure by one of the parties to make

reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Id.* (quotation marks omitted); *accord Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir. 1999). For instance, "when the parties are missing information that can only be provided by one of the parties, the party withholding the information may be found to have obstructed the process." *Jackson v. City of Chi.*, 414 F.3d 806, 813 (7th Cir. 2005) (quotation marks omitted); *accord Stewart*, 589 F.3d at 1308–09. In sum, to establish that her request was "denied," Ward must show either that the BVA in fact ended the interactive process or that it participated in the process in bad faith.

Here, the interactive process broke down before the BVA decided on Ward's request and no reasonable juror could have found that the BVA, rather than Ward, was responsible for the breakdown. Ward first asked for an accommodation in March. In April, Ward presented her supervisor with a brief letter from her physician saying little more than that she was receiving treatment for a chronic medical condition that requires daily treatment and would "benefit from a schedule that allows her to work from home." JA 205. The letter cast doubt on Ward's capacity to continue working full-time, however, by stating that "[t]he maximum number of daily work hours will be determined as the condition stabilizes." JA 205. Accordingly, on May 3, Ward's supervisors met with her in person and requested more information about her condition. They repeated the request in writing the same day, setting forth

the information needed by the BVA to evaluate Ward's "ability to perform the duties of [her] position." JA 243. Ward produced a letter from another physician in response but it too left doubt about her ability to work full-time by noting that she could not sit for long periods and that her treatments take one to three hours at a time. On May 25 and 31—*i.e.*, within days of receiving the physician's letter—Ward's supervisors twice met with her to discuss her request.[3] On June 5, the BVA set forth in writing precisely the information it needed to "reasonably accommodate [Ward's] request for a [work-from-home] arrangement." JA 246. Ward did not respond but instead resigned six days later. As the district court concluded, the interactive process broke down when Ward "walked away." JA 874.[4]

---

[3] Ward's deposition testimony that her request was denied at the May 31 meeting differs from the testimony of the other participants in the meeting. Although we view the evidence in the light most favorable to Ward, the letter Ward received on June 5 (and had asked for at the meeting) made clear that, whatever was said at the meeting, her accommodation request was still under consideration.

[4] As noted, the district court also concluded that no reasonable juror could find Ward's request had been denied because the BVA "offered her the exact accommodation she sought" in its August 8 letter. JA 877. Because we conclude the interactive process had broken down when Ward resigned two months earlier, we need not address whether the BVA's August 8 letter—which said the BVA was "willing to consider allowing [Ward] to try work-from-home on a full-time basis," JA 261—in fact offered her the accommodation she sought or whether the letter is further evidence of the BVA's willingness to continue the dialogue. We note, however, that the August 8 letter came after Ward had made plain her intent to sue. *See* JA 258. The BVA's offer in the face of litigation cannot be viewed as evidence of pretext.

We addressed similar circumstances in *Stewart*, in which the plaintiff was a housekeeper at a mental facility whose interactions with the patients caused her own mental health to deteriorate. 589 F.3d at 1306–07. When the plaintiff requested a transfer, a supervisor promptly met with her and told her that he would help her as soon as she completed paperwork documenting her disability. *Id.* at 1307. She left work that afternoon and never returned. *Id.* She sued, claiming her employer had denied her a reasonable accommodation but the district court granted the employer's motion for judgment as a matter of law. *Id.* We affirmed because "[n]othing in the evidence presented suggest[ed] that [the supervisor] acted in anything but an entirely appropriate manner" when he met with the plaintiff and requested medical documentation. *Id.* at 1308–09. In so holding, we cited two cases from our sister circuits that closely resemble Ward's case. *See id.* at 1309 (citing *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1136 (7th Cir. 1996) and *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998)).

In *Beck*, the plaintiff was a secretary who suffered from arthritis, depression and anxiety. 75 F.3d at 1132. Upon returning from medical leave, she asked for an unspecified accommodation for her depression. The employer sought further information from her physician but none was provided. *Id.* at 1133. The plaintiff took another period of medical leave and again sought an accommodation upon her return. This request was somewhat more specific—it sought an adjustable keyboard for her arthritis and a reduced workload to ease the transition back to work. The request was also accompanied by a letter from her physician. *Id.* Still uncertain what accommodations were necessary, the employer again sought more detailed information and got none. *Id.* The employer also took steps to accommodate the plaintiff based on the information it had but was unable to accommodate the plaintiff

to her satisfaction. *Id.* at 1136–37. She sued and the Seventh Circuit affirmed the district court's grant of summary judgment to the employer because "[a]t no point did the [employer] fail to respond in some manner to [the plaintiff's] requests for accommodation, and there is nothing in the record from which we can discern any attempt by the [employer] to sweep the problem under the rug." *Id.* at 1136. The court observed that "the information required to determine the necessary accommodations was of the type that only [the plaintiff] could provide" and "where . . . the employer makes multiple attempts to acquire the needed information, it is the employee who appears not to have made reasonable efforts." *Id.* at 1137.

In *Templeton*, the plaintiff suffered serious head and neck injuries in an automobile accident. 162 F.3d at 618. Her physician sent her employer a letter explaining her condition and expressing uncertainty as to the plaintiff's ability to return to work. The employer requested further information from the physician but the plaintiff refused to authorize the information's release. *Id.* The Tenth Circuit affirmed the district court's grant of summary judgment to the employer, explaining that "[a]n employer cannot be expected to propose reasonable accommodation absent critical information on the employee's medical condition and the limitations it imposes." *Id.* at 619. Also in accord is *Jackson*, in which the Seventh Circuit affirmed the district court's grant of summary judgment to the employer because the employer sent the plaintiff several letters asking for more detailed medical information and got only conclusory responses. 414 F.3d at 813–14. By contrast, cases in which our sister circuits have found genuine issues of fact regarding the responsibility for the breakdown of the interactive process typically include evidence that the employer was in some way unresponsive to the plaintiff's requests for accommodation. *See, e.g.*, *Sears*, 417 F.3d at 807–08 (plaintiff "made several requests for accommodations

which [the employer] simply denied" and employer, "unlike the defendants in [*Beck* and *Jackson*,] . . . did not actively engage in the interactive process by suggesting possible accommodations or requesting information that would help it do so"); *Fjellestad v. Pizza Hut of Am., Inc*, 188 F.3d 944, 952–53 (8th Cir. 1999) (employer did not discuss possible accommodations with employee); *Taylor*, 184 F.3d at 315–16 (notwithstanding fact that plaintiff's son "requested accommodations [for plaintiff], informed [the employer] about [plaintiff's] condition, and provided [the employer] with the means to obtain more information if needed," employer "offered no accommodations or assistance in finding them, made [plaintiff's] job more difficult, and simply sat back and continued to document her failures").

Here, the BVA's participation bore all the hallmarks of good faith. Ward's supervisors promptly responded to her request for an accommodation, met with her on several occasions to discuss the request and sought more information from her physician to help them determine an appropriate accommodation. Like the plaintiffs in *Stewart*, *Beck*, *Templeton* and *Jackson*, Ward did not provide the requested information. Instead, she resigned. No reasonable juror could have found that the BVA denied Ward's request for an accommodation, then, because Ward abandoned the interactive process before the BVA had the information it needed to determine the appropriate accommodation.[5] The district court

---

[5] Ward notes that the BVA has a "flexiplace" or "telework" policy whereby BVA employees whose job duties and performance records meet certain criteria may work from home with the approval of their supervisor. *See* JA 804, 807–08; *see also* JA 654–57. The existence of such a policy and any history of the employer allowing similarly situated employees to work from home are undoubtedly relevant to whether a work-from-home arrangement is a reasonable accommodation. *See Woodruff*, 482 F.3d at 528. But in those

correctly awarded summary judgment to the VA Secretary because Ward "fail[ed] to make a showing sufficient to establish the existence of an element essential to [her] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[6]   Ward is

---

instances where the BVA granted other employees' work-from-home requests due to disabilities, adequate medical documentation had been provided. *See* JA 518–22, 662–67, 815. Our dissenting colleague appears to view the full-time telework arrangement as the rule, not the exception, and concludes that the BVA must *immediately* grant the request of any fully successful employee who seeks to work from home. *See* Dissenting Op. 2–3. The reverse is true. *See* JA 807 ("Position suitability and availability of staff and resources are considerations for management when determining employee participation [in a telework arrangement]. . . . VA employees selected for telework arrangement . . . should have a history of being reliable, responsible, and able to work independently. . . . The supervisor is responsible for determining how many days per week are appropriate for a telework arrangement. *Each arrangement to telework is to be considered individually*." (emphasis added)).   Although it might have been reasonable for the BVA to permit Ward to work from home, it does not follow that the BVA exhibited bad faith by not immediately granting Ward that accommodation without further inquiry. *Cf. Mogenhan*, 613 F.3d at 1168 (noting "there are certainly circumstances in which a long-delayed accommodation could be considered unreasonable" (quotation marks omitted)).   There was no long delay here.   No more than three months passed from Ward's first request to her resignation and much of that time was spent waiting for Ward to provide more information about her condition. Had the process been allowed to play out, the BVA may well have settled on a full-time work-from-home accommodation; it may instead have thought of other reasonable accommodations.   Ward cannot cut the process short and then blame her employer for not immediately granting her specific request.

[6] Our dissenting colleague deems the information sought by the BVA in the June 5th letter "irrelevant."   Dissenting Op. 3.   We

the author of her misfortune—she and the BVA parted ways not because the BVA discriminated or retaliated against her based on her disability but because she acted precipitately.

## III. Constructive Discharge Claim

Ward contends that she was constructively discharged because the BVA's "*continued* refusal[,] obstruction and delay in accommodating [her] limitations made working conditions so intolerable that any reasonable person with her disability would feel compelled to resign." Br. of Appellant at 50, *Ward v. Shinseki*, No. 12-5374 (D.C. Cir. Nov. 13, 2013). A claim of constructive discharge based on disability discrimination "must be predicated on a showing of either intentional discrimination, or retaliation." *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 370 (D.C. Cir. 2007) (quotation marks omitted); *see also Johnson v. Shalala*, 991 F.2d 126, 131–32 (4th Cir. 1993) (elements of constructive discharge not met by failure to accommodate absent "evidence that the employer intentionally sought to drive [employee] from her position"); *cf. Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (under Title VII of the Civil Rights Act of 1964, "a finding of constructive discharge depends on whether the employer deliberately made working conditions intolerable and drove the employee out" (quotation marks omitted)). We have already concluded that the BVA did not deny Ward's accommodation request but rather

disagree. Whether it was an "essential feature[] of Ward's job," *id.* at 4, to sit for prolonged periods or to carry heavy case files, Ward's ability to perform these tasks was unquestionably relevant in determining a reasonable accommodation. By asking these questions, the BVA sought—as EEOC regulations instruct—to know the "precise limitations resulting from the disability" so that it could determine "potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3).

responded promptly and in good faith. Ward's inability to make out a claim of failure to accommodate "necessarily means that her constructive discharge claim fails." *Cole v. Powell*, 605 F. Supp. 2d 20, 26 (D.D.C. 2009).

For the foregoing reasons, we affirm the district court's grant of summary judgment to the VA Secretary.

*So ordered.*

MILLETT, *Circuit Judge*, dissenting: "Everything should be made as simple as possible, but not simpler."[1] And therein lies the critical flaw in the majority opinion's analysis. The opinion paints a logically alluring picture: Ella Ward sought an accommodation, but rather than give the Secretary of Veterans Affairs the information needed to provide it, she walked away. How could anyone blame the Secretary for that?

The problem is that the essential predicate for the majority opinion's conclusion—that the June 5th letter to Ward from her supervisors sought only information "*needed* to 'reasonably accommodate'" her, Maj. Op. 12 (emphasis added)—long ago evaporated. The Secretary admits that he did not *need* the demanded information to accommodate Ward; the letter sought nothing that was tied to the actual demands of her job; and the information demanded was irrelevant to ensuring that her requested flexiplace accommodation was practicable. The factual record, in other words, pulls the legal rug out from under the majority's feet. Ward cannot be saddled with legal responsibility for failing to respond to questions her supervisors had no business asking. That is especially so because her increasing inability to properly treat her lymphedema in the office was literally endangering her life, making the delay caused by her supervisors' unjustified factual detours acutely harmful.[2]

There are three essential points on which the majority and I part company:

---

[1] *See The Ultimate Quotable Einstein* 475 (Alice Calaprice ed. 2011).

[2] While the ultimate determination of the facts should be for the jury, this dissent views all of the disputed material facts in the light most favorable to Ward, as the law requires. *See, e.g.*, *Mogenhan v. Napolitano*, 613 F.3d 1162, 1165 (D.C. Cir. 2010).

### *1. THE FLEXIPLACE WORK OPTION NEVER BEFORE REQUIRED A SHOWING OF MEDICAL CONDITION*

The majority opinion starts on the wrong track. It assumes that some showing of medical necessity and physical compatibility is a precondition for an employee in the Department of Veterans Affairs to work from home. Not so. As the majority opinion acknowledges, the Department's flexiplace program is available to employees "whose job duties and performance records meet certain criteria." Maj. Op. at 15 n.5; *see also* J.A. 807. Ward came forward with evidence that her employment position and her "fully successful" rating qualified her to work at home under the program. J.A. 447. The majority opinion's assumed predicate showing of "adequate medical documentation" (Maj. Op. at 16 n.5) appears nowhere in the program criteria; it never even mentions physical condition.

Nor does the Secretary of Veterans Affairs contend that otherwise-qualified employees have had to make a threshold showing of medical need to enjoy the work-at-home option. At least not for any employee other than Ward, whom the Secretary apparently chose to put on a different track with different demands *because of* her disability. J.A. 769. Perhaps the Secretary would say that he was concerned with how Ward would juggle her medical treatments and full-time work. But given that (i) Ward met the preexisting criteria for participation in the flexiplace program; (ii) Ward had already been working successfully full time in the office with her acute disability for the preceding two months, (iii) Ward had assured her supervisors that "I'm confident I would produce my three cases * * * if I could sit there in my [medically required state of undress] and prop my leg up and do what I need to do," J.A. 565, and (iv) the presence of Ward's disability is the only discernible reason for the supervisors'

distrust of Ward's judgment, a jury could just as likely find that, by demanding that Ward make an exceptional showing not required of other flexiplace applicants, Ward's supervisors got the accommodation process wrong from the get-go.

The majority opinion responds that normal flexiplace procedures did not entitle Ward to an "*immediate[]*" grant of her requested accommodation. Maj. Op. at 16 n.5. No one said they did. The relevant question is whether a jury could find the accommodation process was needlessly *prolonged*. And, as the majority elsewhere acknowledges, it was after Ward had already spent "three months" (*id*. at 17 n.5) meeting her supervisors' evidentiary inquiries that the June 5th letter demanded that Ward chase down admittedly unneeded information.

### 2. THE INFORMATION DEMANDED WAS IRRELEVANT

While the majority opinion places dispositive reliance on Ward's supervisors' need in the June 5th letter for more information, it is telling that the opinion never—not even once—says *what* extra information that letter sought. And that inquiry is what makes all the difference, because the Secretary has since confessed that not one bit of the information he sought was "needed to 'reasonably accommodate'" Ward (Maj. Op. at 12), or has any relevance to *any* of the essential functions of Ward's job. Not one.

The letter demanded that Ward have her physician document: "how many hours, in total, that you are able to work sitting at your desk reviewing case files and drafting decisions during the approved work day, i.e., during a continuous period from 8.5 to 10 hours"; and "whether you are capable of transporting case files and a laptop computer back and forth to work at least once a week, which may weigh, collectively, up to about 45 pounds, and whether you

can lift individual cases that may weigh over 25 pounds each, at home." J.A. 247. The letter thus purported to identify three essential features of Ward's job: (i) sitting, rather than standing or alternating positions, for long periods of time, (ii) completing work during a block of time lasting no more than ten hours per day, and (iii) carrying heavy case files in stacks of up to 25 pounds at a time. None of that holds true.

*First*, it was simply false to assert that Ward's job as a lawyer requires that she "sit[] at [he]r desk * * * during a continuous period from 8.5 to 10 hours." J.A. 247. In his deposition, Ward's supervisor and the author of the June 5th letter, Steven Cohn, admitted that "[i]t wasn't a question of, can you sit for a period of time; can you stand for a period of time," since the need is just for employees to "be[] at home and doing the work[;] People at home—I mean, people can proofread and walk around." J.A. 726–727.

That makes sense. Ward is a lawyer whose job was to review cases and prepare draft decisions. She could do that sitting down; she could do that standing up; she could alternate positions; she could even do that walking around with a dictation machine. J.A. 754.[3] No one disputes that; Cohn admits it. So that portion of the supervisors' letter sought information that was decidedly *not* "needed" (Maj. Op. at 12) to accommodate Ward.

*Second*, the Secretary undisputedly does not demand that employees in the flexiplace program complete their work within a pre-set, ten-hour window in a given work day. The

---

[3]    Indeed, adjustable and standing desks have become commonplace. *See, e.g.*, Steve Lohr, *Taking a Stand for Office Ergonomics*, NEW YORK TIMES, Dec. 1, 2012, http://www.nytimes.com/2012/12/02/business/stand-up-desks-gaining-favor-in-the-workplace.html.

Department of Veterans Affairs Handbook specifically identifies a "modified work schedule" as a possible accommodation for a disabled employee. J.A. 268. In keeping with that policy, the Secretary has previously allowed a lawyer working from home in the flexiplace program to pick up case files "other than during [her] official duty day," including "during the workweek or evening, or on the weekend[.]" J.A. 815. And Jonathan Kramer, another of Ward's supervisors, admitted in his deposition that a modified work schedule "would suffice as a possible reasonable accommodation for an employee with a disability," but that he "did not think about" that possibility, J.A. 499–500, notwithstanding Ward's request for such flexibility. Thus, the supervisors' insistence that Ward document her ability to complete her work within a rigid ten-hour block of time was a makeweight.

*Third*, while the letter insisted that Ward document her physical ability to carry heavy case files, Cohn again gave away the game, admitting the irrelevancy of that demand. Cohn's letter itself acknowledged that "the Board can assign a cart for you to use, or you can always ask me or [an]other management official on the team for assistance in transporting any heavy case files." J.A. 246. That accords with the Board's treatment of another of Ward's colleagues in the flexiplace program, who was allowed to have her "husband or another individual assist [her] in transporting [work] materials to [her] Alternate Work Station[.]" J.A. 815. What is more, Kramer admitted in his deposition that, at home, Ward could have moved the necessary documents piece by piece, rather than all at once in heavy stacks. *See* J.A. 493. Weight-lifting, in short, is confessedly not an essential element of Ward's lawyer position or required for a reasonable accommodation to work. So when the majority opinion says the supervisors' demand for proof that Ward "can lift individual cases that

may weigh over 25 pounds each, at home" was seeking "precisely the information it needed to 'reasonably accommodate'" her, Maj. Op. at 12, that is just not correct.

The majority opinion points to the requirements for the flexiplace program. Maj. Op. 16 n.5. They prove my point: prolonged sitting and heavy lifting make no appearance. The policy instead lists "[p]osition suitability," which is undisputed for Ward's job; and a jury could reasonably find Ward "reliable, responsible, and able to work independently" given her work record, as a long-term and "fully successful" employee, and her persevering service even with her disabling condition. *See id.* The majority opinion's reference to "adequate medical documentation" submitted by others (*id.*) is even harder to understand, because, again, not one of those employees was asked about sitting endurance or dead-lifting case files.

The majority opinion reasons that, even though irrelevant to Ward's job performance, the information sought in the June 5th letter was "unquestionably relevant in determining a reasonable accommodation." Maj. Op. at 17 n.6. But not even the Secretary argues that any such showing of physical conditioning is needed to work at home rather than in the office. Nor was any such showing demanded of any other employee—disabled or not.

If more were needed, the supervisors' abrupt reversal of course on August 8th provides it. Without having received one bit of the information that the majority opinion deems so essential to granting Ward an accommodation, the Secretary offered Ward the opportunity to "try work-from-home on a full-time basis." J.A. 261. The Secretary confirmed at oral argument that, in the August 8th letter, the supervisors decided to "try what she's asking for." Oral Arg. Tr. at 18:7–

18:8.  But the supervisors knew no more in August than they knew in June.  If no more information was needed to "try what she's asking for" in August, it could not have been "unquestionably relevant" just two months earlier.  Presumably, the pointlessness of the June 5th inquiry is why the Board of Veteran Appeals' Assistant General Counsel advised those supervisors in August that they "should have just offered, at that point, offered the arrangement she requested."  J.A. 769.

To that, the majority opinion simply asserts that "the [Department's] offer in the face of litigation cannot be viewed as evidence of pretext."  Maj. Op. 13 n.4.  But this is summary judgment, so the question should not be how appellate judges view the evidence, but whether a reasonable jury could view things differently based on not only the August 8th reversal of course, but also the Department's admissions that the information was unneeded and its failure to demand a similar showing from any other employee admitted into the flexiplace program.

Finally, counsel for the Secretary protested at argument that Ward "wasn't entitled to get the position," but that the Secretary offered it anyway because "they liked her, they thought she was a good employee."  Oral. Arg. Tr. at 19:2–19:7.  Counsel cannot mean what he said.  Surely the Secretary would not expend taxpayer money giving Ward a make-work sinecure.  Nor, given her "fully successful" rating and proven ability to perform her job for two months even under the physically onerous conditions of in-office work, J.A. 447, does the record foreclose a reasonable jury from finding that she was a qualified individual with a disability.  Instead, counsel could only have meant the Secretary felt legally entitled to delay her accommodation until she ran a gauntlet of intrusive and entirely unnecessary questioning.

8

### 3. WARD'S SUPERVISORS OBSTRUCTED THE ACCOMMODATION PROCESS

Because the Secretary's concessions expose the June 5th letter's informational demands as a contrivance, the majority opinion's discussion (Maj. Op. at 13-15) of case law permitting employers to seek "critical" information that is genuinely "needed" to formulate a reasonable accommodation is quite beside the point. Far from requesting needful information, the Board demanded that Ward have her physician certify to a litany of irrelevancies. And her supervisors did so not in the heat of the moment during a meeting, but after fully considering their position for five days after the May 31st meeting. A reasonable jury thus could find that this case involves supervisors throwing up obstacles to an accommodation that were not applied to other employees and that have no bearing on the reasonableness of the accommodation sought. That employers may not do. *See, e.g.*, *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 695–696 (7th Cir. 1998) (refusing to grant summary judgment to an employer because it may not have participated in good faith in finding accommodation); *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1021 (8th Cir. 2000) (same).

The majority opinion emphasizes that the employer never failed to respond "in some manner" to Ward. Maj. Op. at 14 (quoting *Beck v. University of Wisconsin Board of Regents*, 75 F.3d 1130, 1136 (7th Cir. 1996)). True. But the accommodation process is not a verbal game of tag in which the last person to say something wins. The point of the interactive process is to exchange the information needed to determine whether a reasonable accommodation of a qualified individual can be made.

9

In this case, as the majority opinion suggests (Maj. Op. at 12 n.3), the facts taken in the light most favorable to Ward show that her supervisors cut off the accommodation process at a meeting on May 31st when they laughed at her, humiliated her, and denied her request to work at home full time unless and until Ward met their demands for unneeded information. J.A. 580–581. On that record, a jury could find that the employer's demands amounted to stonewalling, and thus that it is the employer that broke down the process. *Id.* at 580 (Ward: "I'm trying to get here to do my job. You know I'm suffering, and * * * you're dragging your feet on it."). And while the majority opinion concludes that the June 5th letter saves the day, Maj. Op. 12 n.3, that rationale simply cannot survive a review of the letter's content and the Secretary's admissions.

The costs of such delaying inquiries, moreover, can be dire for some individuals with disabilities, as this case illustrates. Ward's lymphedema can be life threatening, and working full time at the office while her supervisors debated giving her the already-established flexiplace option was taking a severe physical toll on Ward. J.A. 195, 600. Insisting, as her supervisors did in that June 5th letter, that she go back to the well for information no one needed before giving her the accommodation was anything but the harmless delay that the majority opinion posits (Maj. Op. at 16 n.5).[4]

\* \* \* \* \*

---

[4] The district court granted summary judgment on Ward's constructive discharge claim for the same flawed reasons it turned away her accommodation claim, *Ward v. Shinseki*, No. 10-cv-1414 (RLW), 2012 WL 5839711 at \*10 (D.D.C. Nov. 19, 2012), so I would remand to the district court to reconsider that claim in the first instance.

What actually happened in this case—who is right and who is wrong—is for a jury, not an appellate court, to decide. All that matters at this juncture is that, once the actual content of the June 5th letter and the Secretary's admissions are factored in, a reasonable jury could disagree with the majority opinion that Ward's supervisors were just seeking "information [they] needed to determine the appropriate accommodation" (Maj. Op. at 15), and could instead find that it was Ward's supervisors that obstructed the accommodation process.

For five years, Ward proved herself a hard-working, fully successful attorney for the Department of Veterans Affairs. All she asked for was the same flexiplace program afforded other employees in her position, whether or not they were disabled. Her supervisors' withholding of that readily available accommodation until she chased down admittedly unneeded information is precisely the type of conduct the Rehabilitation Act was meant to stop—or so a jury could find. I respectfully dissent.